2006 WY 44

**THUNDER BASIN COAL COMPANY,**
Appellant (Petitioner),

v.

**CAMPBELL COUNTY, Wyoming**
Assessor, Appellee
(Respondent).

Nos. 05–117, 05–118, 05–119.

Supreme Court of Wyoming.

April 12, 2006.

Representing Appellant: Lawrence J. Wolfe of Holland & Hart, LLP, Cheyenne, Wyoming.

Representing Appellee: Carol Seeger, Deputy Campbell County Attorney, Gillette, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

KITE, Justice.

[¶ 1] In these consolidated appeals, Thunder Basin Coal Company (Thunder Basin) contests the Campbell County Assessor's (County Assessor) ad valorem tax assessments for the tax years 2001 and 2002 on its personal property at the Black Thunder and Coal Creek Mines in Campbell County. Thunder Basin argues the County Assessor greatly overvalued the personal property, including machinery, equipment and buildings, located at each mine. For both years, Thunder Basin argues the County Assessor improperly used the allocated purchase price it paid when it purchased the mines in 1998, rather than the original cost of the individual items of property, to calculate the total value using the cost method. Thunder Basin also contends the County Assessor failed to properly account for economic obsolescence and the Campbell County Board of Equalization (County Board) failed to make appropriate findings of fact and conclusions of law. We affirm the County Board's decisions in Cases No. 05–117 and 05–119. With regard to Case No. 05–118, we conclude the matter is not properly before this Court and, consequently, dismiss that case for lack of jurisdiction.

## ISSUES

[¶ 2] In Case No. 05–117, Thunder Basin presents the following issues for review:

A. In determining the value of personal property and improvements to real property, the County Assessor is re-quired by Department of Revenue rules to account for all three forms of depreciation: physical depreciation, functional obsolescence and economic obsolescence. Campbell County's Assessor completely ignored economic obsolescence in arriving at the value of the property of the Black Thunder Mine for tax year 2001. The State Board's decision affirming the County Board and Assessor is erroneous and must be reversed.

B. Campbell County's Appraiser treated all property at both mines as new on June 1, 1998, the date Arch acquired TBCC from ARCO. This ignored the physical depreciation of the property and is not in accordance with generally accepted appraisal techniques. The State Board decision failed to correct this appraisal defect, which constitutes appropriate grounds to reverse the State Board's ruling.

C. The State Board and County Board decisions are fatally flawed as they do not contain sufficiently detailed findings of fact and conclusions of law to adequately explain their decision regarding economic obsolescence.

The County Assessor articulates the issue in Case No. 05–117 as follows:

Whether the decision of the Board affirming the 2001 assessed value of petitioner's personal property established by the Campbell County Assessor was (a) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege or immunity; (c) in excess of statutory jurisdiction or authority; (d) without observance of procedures required by law; or (e) unsupported by substantial evidence.

In Case No. 05–118, Thunder Basin poses the following issues on appeal:

A. Is the Campbell County Board of Equalization's decision fatally flawed because it failed to set forth the rationale for its decision?

B. Did the State Board of Equalization exceed its authority when it acted as

an expert appraiser, thereby poisoning further review by the Campbell County Board of Equalization?

C. Are the Campbell County Board of Equalization's findings of fact regarding the life of the facility contrary to substantial evidence?

D. Is the Campbell County Assessor's determination of physical depreciation, which has the effect of treating the property as new in 1998, contrary to appraisal practice and the Department of Revenue's instructions?

E. Whether the appraisal judgments of the Campbell County Board of Equalization and State Board of Equalization, particularly as to economic obsolescence, are wrong, contrary to substantial evidence and arbitrary and capricious?

F. Whether the decisions of the Campbell County Board of Equalization and State Board of Equalization violate Wyoming Constitution Article 15, § 11 because the fair market value of the property was not determined using a rational method, equally applied, that results in essential fairness?

In Case No. 05–119, Thunder Basin's issues are similar to those in Case No. 05–118:

A. Is the Campbell County Board of Equalization's decision fatally flawed because it failed to set forth the rationale for its decision?

B. Is the Campbell County Assessor's determination of physical depreciation, which has the effect of treating the property as new in 1998, contrary to appraisal practice and the Department of Revenue's instructions?

C. Whether the appraisal judgments of the Campbell County Board of Equalization and State Board of Equalization, particularly as to economic obsolescence, are wrong, contrary to substantial evidence and arbitrary and capricious?

D. Whether the decisions of the Campbell County Board of Equalization and State Board of Equalization violate Wyoming Constitution Article 15, § 11 because the FMV of the property was not determined using a rational method, equally applied, that results in essential fairness?

The County Assessor does not provide a separate statement of the issues in either Case No. 05–118 or Case No. 05–119.

## FACTS

[¶ 3] Thunder Basin, which is owned by Arch Coal, Inc. (Arch Coal), purchased the Black Thunder and Coal Creek Mines located in Campbell County in 1998. Thunder Basin closed the Coal Creek Mine in 2000.

### Case No. 05–117—Black Thunder and Coal Creek Mines—Tax Year 2001

[¶ 4] For the tax year 2001, the County Assessor contracted with a private company, Thos. Y. Pickett & Company, Inc. (Pickett), to appraise the personal property located at the mines. Pickett had provided this service for Campbell County since the mid–1980s and performed approximately twenty complex mine appraisals each year. Pickett requested Thunder Basin provide certain information, including an asset list and depreciation schedules for all buildings, machinery, and equipment, by February 15, 2001. Thunder Basin missed the deadline, but, sometime after February 26, 2001, Thunder Basin's property tax manager sent Pickett a fixed assets schedule. The schedule contained "current book costs, taken from an appraisal by Price Waterhouse Coopers LLP at the time of acquisition [of the mines from ARCO] in June, 1998." Thunder Basin did not provide any depreciation schedules until after the tax assessments were issued by the County Assessor.

[¶ 5] Pickett used the cost based approach to appraise the personal property at the mines based upon the information it had received from Thunder Basin. Using Pickett's appraisal, the County Assessor valued the personal property for the Black Thunder mine at $231,558,310 and the personal property at the Coal Creek Mine at $23,861,300. Thunder Basin disagreed with the County Assessor's valuations and employed an independent appraiser, Ernst & Young LLP (Ernst), to value the personal property at the two mines. Ernst completed its appraisal on May 31, 2001, and concluded the personal

property at the Black Thunder Mine was worth $168,788,000 and the property at the Coal Creek Mine was worth $12,459,000. The disparity between Thunder Basin's and the County Assessor's valuations resulted primarily from differences in their respective calculations of physical depreciation and economic obsolescence.

[¶ 6] The County Board held a hearing on June 20, 2001, and, subsequently issued findings of fact and conclusions of law upholding the County Assessor's determinations. Thunder Basin appealed to the State Board of Equalization (SBOE), which affirmed the County Board's decision. Thunder Basin filed a petition for review of the SBOE's decision in the district court, which also affirmed the County Board's rulings. Thunder Basin then appealed to this Court.

### Case Nos. 05–118 & 05–119—Black Thunder and Coal Creek Mines—Tax Year 2002

[¶ 7] In 2002, Campbell County again contracted with Pickett to appraise property at the mines within the county, including Thunder Basin's Black Thunder and Coal Creek Mines. As in 2001, Pickett utilized information provided by Thunder Basin to prepare the appraisals, employing the cost approach. Relying upon the Pickett appraisals, the County Assessor issued property tax valuations for the personal property at the mines. The Black Thunder Mine valuation was $253,547,380, and the Coal Creek Mine valuation was $17,946,290.

[¶ 8] Thunder Basin disagreed with the County Assessor's valuations, and again hired Ernst to conduct an individual or "fee" appraisal of the personal property at both mines. Like Pickett, Ernst used the cost approach to appraise the property. Thunder Basin's appraisals, however, resulted in valuations which were very different from the County Assessor's valuations. For the Black Thunder Mine, Ernst valued the personal property at $153,502,788, which was over $100,000,000 less than the County Assessor's valuation. Ernst valued the Coal Creek Mine personal property at nearly one-half of the County Assessor's appraisal, or $9,724,320.

[¶ 9] Thunder Basin appealed the Black Thunder Mine valuation and the County Board held a hearing. The County Board upheld the County Assessor's valuation, and Thunder Basin appealed to the SBOE which issued a comprehensive decision agreeing with many of the County Board's findings. Nevertheless, the SBOE ultimately concluded the County Assessor failed to properly calculate economic obsolescence of the personal property at the Black Thunder Mine and, therefore, the County Board's decision affirming the County Assessor's valuation for that mine did not comply with the law. Consequently, the SBOE ordered: "The decision of the County Board affirming the Assessor's valuation of [Thunder Basin's] property shall be and the same is, hereby **remanded**." (emphasis in original). Even though Thunder Basin ostensibly prevailed before the SBOE, it filed a petition for review with the district court. The district court affirmed the SBOE's decision, "including its remand to the County Board." Still not content, Thunder Basin appealed to this Court.

[¶ 10] Thunder Basin also appealed the Coal Creek Mine 2002 assessment. As stated above, Thunder Basin closed the Coal Creek Mine in 2000. By 2002, much of the machinery and equipment had been removed from the mine, and the buildings were unoccupied. As in 2001, the difference between the County Assessor's and Thunder Basin's valuations of the personal property at the Coal Creek Mine rested largely upon the appraisers' divergent calculations of physical depreciation and economic obsolescence. Consequently, Thunder Basin focused on those issues at the hearing before the County Board. The County Board concluded the County Assessor's valuations complied with law and, consequently, affirmed the valuations. Thunder Basin appealed to the SBOE, which also affirmed. Thunder Basin filed a petition for review with the district court, and that court affirmed the County Board's decision, leading to an appeal to this Court.

### STANDARD OF REVIEW

[¶ 11] Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2005) sets forth the scope of appellate review for agency decisions:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 12] When an appealing party contests an agency's findings of fact, we examine the entire record to determine if the agency's findings are supported by substantial evidence. *RT Communications, Inc. v. State Bd. of Equalization*, 11 P.3d 915, 920 (Wyo.2000), *Laramie County Bd. of Equalization v. Wyo. State Bd. of Equalization*, 915 P.2d 1184, 1189 (Wyo.1996). If the agency's findings of fact are supported by substantial evidence, we will not substitute our judgment for that of the agency and will uphold the factual findings on appeal. *RT Communications*, 11 P.3d at 921. "Substantial evidence is more than a scintilla of evidence; it is evidence that a reasonable mind might accept in support of the conclusions of the agency." *Id.* "When an agency decides that the party charged with the burden of proof has failed

to meet that burden, the case is reviewed under the 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law' language of WYO. STAT. § 16–3–114(c)(ii) (1990)." *Newman v. State ex rel. Workers' Safety & Comp. Div.*, 2002 WY 91, ¶ 12, 49 P.3d 163, 168 (Wyo.2002) (citations omitted). *See also, Veile v. Bryant*, 2004 WY 107, ¶ 9, 97 P.3d 787, 792 (Wyo.2004).

[¶ 13]. With regard to appeals of property tax matters, we have stated:

The Department's valuations for state-assessed property are presumed valid, accurate, and correct. This presumption can only be overcome by credible evidence to the contrary. In the absence of evidence to the contrary, we presume that the officials charged with establishing value exercised honest judgment in accordance with the applicable rules, regulations, and other directives that have passed public scrutiny, either through legislative enactment or agency rule-making, or both.

The petitioner has the initial burden to present sufficient credible evidence to overcome the presumption, and a mere difference of opinion as to value is not sufficient. If the petitioner successfully overcomes the presumption, then the Board is required to equally weigh the evidence of all parties and measure it against the appropriate burden of proof. Once the presumption is successfully overcome, the burden of going forward shifts to the DOR to defend its valuation. The petitioner, however, by challenging the valuation, bears the ultimate burden of persuasion to prove by a preponderance of the evidence that the valuation was not derived in accordance with the required constitutional and statutory requirements for valuing state-assessed property....

* * * *

*Colorado Interstate Gas Company v. Wyoming Department of Revenue*, 2001 WY 34, ¶¶ 9–11, 20 P.3d 528, ¶¶ 9–11 (Wyo. 2001) (citations omitted).

*Airtouch Communications, Inc. v. Dep't of Revenue*, 2003 WY 114, ¶ 12, 76 P.3d 342, 348 (Wyo.2003).[1]

---

1. The quoted material pertains to cases in which     the Department of Revenue assesses the proper-

[¶ 14] The County Assessor's choice of appraisal methods is reviewed under the substantial evidence standard. It is not the duty of the reviewing court

> "to determine which of various appraisal methods is best or most accurately estimates FMV [fair market value]; rather, it is to determine whether substantial evidence exists to support usage of the [particular] method of appraisal, and, if so, whether substantial evidence exists to support the manner in which it was used." *Holly Sugar Corp. v. State Bd. of Equalization*, 839 P.2d 959, 963 (Wyo.1992).

*RT Communications, Inc.* 11 P.3d at 921, quoting *Gray v. Wyo. State Bd. of Equalization*, 896 P.2d 1347, 1350–51 (Wyo.1995).

> The proper application of appraisal methods to the facts is an issue of ultimate fact requiring de novo review. An ultimate fact is a mixture of fact and legal precept.
>
> > "When an agency's determinations contain elements of law and fact, we do not treat them with the deference we reserve for findings of basic fact. When reviewing an 'ultimate fact,' we separate the factual and legal aspects of the finding to determine whether the correct rule of law has been properly applied to the facts. We do not defer to the agency's ultimate factual finding if there is an error in either stating or applying the law."

*Pacificorp, Inc. v. Dep't of Revenue*, 2001 WY 84, ¶ 6, 31 P.3d 64, 65–66 (Wyo.2001) (citations omitted).

[¶ 15] We review an agency's conclusions of law de novo. *Wyo. Dep't of Revenue v. Guthrie*, 2005 WY 79, ¶ 13, 115 P.3d 1086, 1091 (Wyo.2005). If a conclusion of law is in accord with the law, it is affirmed. *Airtouch Communications*, 2003 WY 114, ¶ 10, 76 P.3d at 347. "However, when an agency has failed to properly invoke and apply the correct rule of law, we correct the agency's error." *Id.*

ty. The standard is, however, equally applicable to assessments by county assessors. *See, e.g.,*

## DISCUSSION

### Case No. 05–117—Black Thunder and Coal Creek Mines—Tax Year 2001

[¶ 16] With regard to the 2001 personal property tax assessment for the two mines, Thunder Basin raises three issues on appeal. It alleges the County Assessor erred in his calculation of physical depreciation of both mines by using the 1998 allocated purchase price as the starting point and failed to properly account for economic obsolescence for the Black Thunder Mine. Thunder Basin also claims the County Board's findings of fact and conclusions of law failed to adequately explain its decision.

#### 1998 Values

[¶ 17] We will begin with the issue of the 1998 values which pertains to both mines. Thunder Basin purchased the mines from ARCO in 1998. Throughout its arguments, Thunder Basin contests the County Assessor's use of the values the company allocated to the personal property when it purchased the property in 1998. Thunder Basin claims use of the 1998 values is not the correct way to apply the cost approach. It also claims the values do· not accurately reflect the fair market value of the property because the allocation ·of the purchase price paid by Thunder Basin was for income tax purposes and not to establish fair market value for purposes of property tax.

[¶ 18] Pursuant to the Wyoming Constitution, Art. 15, § 11, property must be uniformly assessed. To accomplish that directive an assessor must adopt " 'a rational method [of appraisal], equally applied to all property, which results in essential fairness.' " *Holly Sugar Corp. v. State Bd. of Equalization*, 839 P.2d 959, 964 (Wyo.1992), quoting *Teton Valley Ranch v. State Bd. of Equalization*, 735 P.2d 107, 115 (Wyo.1987) (Urbigkit, J. concurring). To that end, all property must be valued at its fair market value for property tax purposes. . Wyo. Stat. Ann. § 39–13–103(b)(ii) (LexisNexis 2005). Wyo. Stat. Ann. § 39–11–101(a)(vi) (Lexis-Nexis 2005) defines fair market value as:

*Teton Valley Ranch v. State Bd. of Equalization*, 735 P.2d 107 (Wyo.1987).

(vi) "Fair market value" means the amount in cash, or terms reasonably equivalent to cash, a well informed buyer is justified in paying for a property and a well informed seller is justified in accepting, assuming neither party to the transaction is acting under undue compulsion, and assuming the property has been offered in the open market for a reasonable time....

[¶ 19] The rules and regulations of the Department of Revenue (DOR) provide three methods of appraisal to determine fair market value: cost, sales comparison, and income or capitalized earnings. DOR Rules, Ch. 9, § 6. In the circumstances present in this case, the County Assessor and Thunder Basin agreed the cost approach method of appraisal was the appropriate one to use. As the regulations provide, "The cost approach is a method of estimating value by summing the land value, where applicable, with the depreciated value of improvements.... The cost approach relies on the principle of substitution in which an informed buyer will not pay more for a property than its comparable replacement." DOR Rules, Ch. 9, § 6(b). To apply this method, costs are estimated on the basis of typical reproduction or replacement costs which are then trended (to account for inflation) from the date of acquisition to the tax lien date using an appropriate construction cost index. That trended cost is then depreciated, beginning on the first assessment date after the property is acquired, to reflect the actual value of the item at the time the tax is imposed. Depreciation continues on an annual basis until the residual value is reached. The regulations establish the lowest allowed residual value to be 25% unless the appraiser has sufficient market information to indicate a lower residual value would be appropriate. DOR Rules, Ch. 9, § 6(b)(iv).

[¶ 20] The regulatory definition of the "trended original cost method" refers to trending the "acquisition or original costs." DOR Rules, Ch. 9, § 6(b)(v)(H). In the Personal Property Valuation Manual (Ad Valorem Tax Div.2002), the DOR provides guidelines to counties for purposes of application of the cost approach to appraisal. That man-

ual addresses valuation of used personal property in particular and it states:

Valuing used personal property requires that the Assessor make a decision about the remaining economic life of the equipment. The purchase of used equipment that has not reached the end of its economic life would be valued normally. In otherwords *you would use the purchase price (if accurate) and then trend the property and depreciate it.* If the equipment has reached its residual value, the acquisition cost should be treated as an RCNLD value and frozen at that value, RCN trending and depreciation would not be applied. Residual value is referred to in Chapter 9 of the DOR rules, February 11, 1999.

Personal Property Valuation Manual, § 1, p. 36. (emphasis added).

[¶ 21] Nothing in the statutes, regulations or guidelines prohibits the use of the acquisition cost of used personal property as the starting place for the cost method of appraisal and, in fact, the guidelines seem to direct it. However, Thunder Basin argues that doing so essentially resets the economic life of the used property and treats it as "new" when that is not the case. This "resetting" arguably occurred when the County Assessor applied a standard useful life for like property, assuming the property was new when it was acquired by Thunder Basin in 1998. For example, Thunder Basin argues when valuing a 1991 used dozer acquired in 1998, the County Assessor applied a full useful life of a new dozer to the used dozer. The County Assessor, on the other hand, contends the purchase price, as allocated by Thunder Basin, is the best evidence of the fair market value of the property. In addition, the County Assessor argues those values were provided by Thunder Basin as its "booked values" and, therefore, if any error was made it was Thunder Basin's fault.

[¶ 22] The standard life of personal property affects the depreciation calculation in two ways. It drives both the amount of annual depreciation (100% divided by the number of years in effective life of the property) and the total allowed depreciation which is governed by length of time necessary to reach residual value. Personal Prop-

erty Valuation Manual, § 6–3. Thunder Basin and the County Assessor used the same annual depreciation factor (5% for equipment and 4% for improvements). However, Thunder Basin complains that the County Assessor's appraisal started the effective life of the property in 1998 which resulted in only three years of depreciation compared to many more years when the original date of acquisition (or construction, in the case of improvements) is used. The result of the County Assessor's approach was, in some cases, to presume the useful life of the property extended beyond the life of the mine. The County Assessor claims the assumption that personal property has no value beyond the life of the operation is unfounded. In addition, Thunder Basin's approach allows so much depreciation that the residual value of most of the property was well below the 25% limit established by the regulations.

[¶ 23] As we said, the goal of the appraisal is to estimate fair market value. Wyo. Stat. Ann. § 39–11–101(a)(vi). The County Assessor's expert opined that the many years of depreciation allowed by Thunder Basin's appraisal was unwarranted because the 1998 purchase price was a much better indicator of what a willing buyer would pay a willing seller for the property in an arms length transaction. The County Assessor argued, therefore, the depreciation of the property was taken into account by the buyer and seller in negotiating the 1998 transaction. The County Board concluded the County Assessor's method was in accordance with the law and was a "rational method of appraisal, equally applied to all property."

[¶ 24] After a thorough review, we conclude the record supported the County Board's conclusion. Thunder Basin provided no citation to any guideline, rule or statute requiring the use of the original acquisition date and price when applying the cost method of appraisal. In fact, both the guidelines and the rules suggest, directly and indirectly, the actual acquisition price and date are a proper starting point for applying the cost method to used property. *See also, Jim Paws, Inc. v. Equalization Bd. of Garland County, Arkansas,* 710 S.W.2d 197 (Ark. 1986) (stating the actual sales price of used personal property in an arms length transaction is generally a more accurate means to estimate fair market value than calculating the replacement cost by subtracting depreciation from the trended new cost). Also, the County Assessor's expert testified the older the asset, the less accurate the cost method is, and his approach more closely approximated actual fair market value. *See also, The Appraisal of Real Estate,* pp. 358–59 (Appraisal Institute, 12th ed.1992).

[¶ 25] Thunder Basin pointed out the 1998 allocated purchase price provided to the county was prepared for federal income tax purposes and was not intended to accurately represent the fair market value of the individual items of property. However, Thunder Basin forgets it provided the 1998 values to the County Assessor in response to the County Assessor's requests for current book value information. The County Assessor was entitled to rely upon the information submitted by Thunder Basin as accurate and reliable. As we have repeatedly stated in the past, the taxpayer bears the burden of providing accurate information to the assessor for preparation of a valuation of its properties. *See e.g., Guthrie,* 2005 WY 79, ¶ 14, 115 P.3d at 1092; *Airtouch Communications,* 2003 WY 114, ¶ 39, 76 P.3d at 357; *RT Communications,* 11 P.3d at 927. The taxpayer should not, therefore, be heard to complain when the assessor relies upon the information supplied to him for the particular purpose of establishing value. *Id.*

[¶ 26] The regulations require depreciation to end when a residual value of 25% is reached, "unless the property tax appraiser has collected sufficient market information to indicate a different residual value." DOR Rules, Ch. 9, § 6(b)(iv)(D). In an effort to support his use of residual values of less than 25%, Thunder Basin's expert obtained information from Thunder Basin, including an appraisal completed by Wyoming Machinery, which estimated values for some of the used equipment. The County Board concluded that information was insufficient to justify a departure from the 25% residual value and to do so would be inconsistent with the residual values used for all mines in Campbell County. Thunder Basin simply failed to carry its

burden to overcome the presumption that the County Assessor's reliance on the 25% residual value limit was proper. *Airtouch Communications*, 2003 WY 114, ¶ 12, 76 P.3d at 348. The County Board's decision was well justified and we cannot conclude it acted in an arbitrary or capricious manner in concluding Thunder Basin failed to carry its burden.

[¶ 27] With regard to the calculation of physical depreciation, we can find no error in the manner in which the cost method of appraisal was applied by the County Assessor. Instead, it is clear the differences in value between the County Assessor's and Thunder Basin's appraisals resulted from differences of expert opinion about the proper date for starting depreciation for used property and whether sufficient information existed to justify varying from the 25% limit on residual value. These are precisely the types of differences of expert opinion that are to be resolved by the County Board. *Airtouch Communication*, 2003 WY 114, ¶ 25, 76 P.3d at 352; *Holly Sugar*, 839 P.2d at 963. "The choice of the appraiser regarding which indicator of value is most appropriate and the final value itself are matters of appraisal judgment with which this Court will not interfere if they are supported by substantial evidence." *Id.* The record adequately supports the County Board's decision to accept the County Assessor's opinion and we find no legal error in his application of the cost method.

### Economic Obsolescence

[¶ 28] Thunder Basin contends the County Assessor failed to account for economic obsolescence in arriving at the value of the Black Thunder Mine. Although not stated as a separate issue for review, Thunder Basin's brief also discusses alleged errors in the manner in which economic obsolescence was calculated for the Coal Creek Mine. Because it was addressed in the body of the brief, we will also address economic obsolescence for Coal Creek.

[¶ 29] The rules provide depreciation must be applied in the cost method of appraisal beginning at the first assessment date after the property is acquired. Such depreciation may take the form of physical depreciation, functional obsolescence or economic obsolescence. DOR Rules, Ch. 9, § 6(b)(v)(D). Economic obsolescence is defined as "impairment of desirability or useful life arising from factors external to the property, such as economic forces or environmental changes which affect supply-demand relationships in the market." DOR Rules, Ch. 9, § 6(b)(v)(D)(III) *See also, Holly Sugar*, 839 P.2d at 961. Three methods of measuring economic obsolescence are set out, but they are not exclusive and the DOR regulations do not require the use of those methods. DOR Rules, Ch. 9, § 6(b)(v)(D)(III). Moreover, the regulations do not provide that all forms of depreciation must be found in all instances. *Id.*

[¶ 30] The County Assessor concedes he did not perform any calculations to test for the existence of economic obsolescence for the Black Thunder Mine in 2001. Instead, he contends the 1998 allocated purchase price reflected, on that date, any economic obsolescence that may have existed since the purchase price resulted from an arms length transaction and that transaction was relatively recent. In reference to reliance upon the 1998 values, the County Assessor's expert testified, ". . . this sale, being a fair market sale, all functional and economic obsolescence is negated because a market approach took over." In addition, when questioned about economic obsolescence, the County Assessor's expert testified the "information was not there." It is not completely clear from the record whether he meant there was no indication of economic obsolescence or the information necessary to calculate it was not provided by Thunder Basin.[2] Thunder Basin cites to no statute or regulation that would require a certain method to "test" for economic obsolescence. Given the County Board's conclusion that the 1998 allocated value was a reliable indicator of fair

---

2. Thunder Basin's expert made a brief reference to the coal market and the possibility that it may not continue to support high spot prices. However, lacking was any substantial evidence of

economic forces within .the coal industry that would cause one to believe the Black Thunder Mine suffered from substantial economic obsolescence.

market value at that time, it is not unreasonable that those values would also be relied upon for purposes of economic obsolescence. Obviously, that approach becomes less viable as more time elapses between the sale and the assessment date. In fact, in the 2002 assessment process, the County Assessor no longer took that approach, but instead performed an analysis of income shortfall to determine whether economic obsolescence existed. The County Board concluded Thunder Basin did not meet its burden of showing the County Assessor's appraisal was flawed or did not comply with generally accepted appraisal practices. We cannot say the County Assessor's approach in 2001 was arbitrary or contrary to law. As we noted above, reliance upon the 1998 values as accurately reflecting the fair market value of the property at that time was supported by substantial evidence.

[¶ 31] We turn now to the issue of the economic obsolescence calculation for the Coal Creek Mine. Although not stated as a separate issue for review, Thunder Basin argues, in one page of its brief, the County Assessor's calculation of economic obsolescence for the Coal Creek Mine improperly included the value of the reserves and working capital, neither of which are subject to personal property tax. However, Thunder Basin fails to provide any citation to the record where such error occurred. Thunder Basin's evidence in the record on this issue consists only of a conclusory, four sentence statement by its expert that because the County Assessor's appraisal did not deduct income attributable to the reserves and working capital from the total income when conducting its income shortfall calculations, it somehow indirectly taxed those items. Without further explanation, he simply stated "essentially that's what happened there. . . ." On this record, Thunder Basin clearly did not meet its burden of establishing the economic obsolescence portion of the County Assessor's valuation was incorrect. Moreover, as can be seen in the SBOE's discussion concerning the 2002 assessment, removal of those items from the total income when calculating income shortfall, as advocated by Thunder Basin's appraiser, may not have been the proper approach. *See, The Ap-*

*praisal of Real Estate, supra,* 358–59. Instead, the percentage shortfall in total income is simply applied only to the personal property at the end of the calculation. Thunder Basin failed to carry its burden with regard to overcoming the presumption of correctness enjoyed by the County Assessor's valuation in this regard. *Airtouch Communications,* 2003 WY 114, ¶ 12, 76 P.3d at 348; *Colorado Interstate Gas Company,* 2001 WY 34, ¶¶ 9–11, 20 P.3d at 531.

*Adequacy of County Board's Findings and Conclusions*

[¶ 32] Thunder Basin contends the County Board's decision was inadequate and did not comply with the law because its findings of fact and conclusions of law did not specifically address the issue of economic obsolescence. In particular, Thunder Basin points out that the SBOE's order relied on different record citations than the County Assessor's brief does to support the reasoning of the County Board on this issue. Thus, contends Thunder Basin, the reasoning of the County Board cannot be identified on review and its decision must be remanded for adequate findings.

[¶ 33] Wyo. Stat. Ann. § 16–3–110 (LexisNexis 2005) sets forth the statutory requirements for an agency's final decision:

A final decision or order adverse to a party in a contested case shall be in writing or dictated into the record. The final decision shall include findings of fact and conclusions of law separately stated. Findings of fact if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings.

Although there is no bright line rule for determining the adequacy of an agency's findings of fact, we have described the attributes of sufficient findings of fact as follows:

In discharging its duty under [Wyo. Stat. Ann.] § 16–3–110, the agency must "make findings of basic facts upon all of the material issues in the proceeding and upon which its ultimate findings of fact or conclusions are based." *Pan American Petroleum Corporation v. Wyoming Oil*

*and Gas Conservation Commission*, 446 P.2d 550, 555 (Wyo.1968). This Court needs to know "why" an agency decided the way it did. When an agency does not make adequate findings of basic fact, we do not have a rational basis upon which to review its ultimate findings and conclusions.

*Davis v. City of Cheyenne*, 2004 WY 43, ¶ 12, 88 P.3d 481, 486–87 (Wyo.2004), quoting *State ex rel. Dep't of Transp. v. Legarda*, 2003 WY 130, ¶ 13, 77 P.3d 708, 713 (Wyo. 2003). "Similarly, we have held that a contested case hearing must provide, and the record of that proceeding must document, information sufficient to the making of a reasonable decision." *Jackson v. State ex. rel. Wyo. Workers' Comp. Div.*, 786 P.2d 874, 878 (Wyo.1990). Absent such information, the agency decision must be set aside as arbitrary. *Id.* Incomplete or insufficient findings of fact fall under the umbrella of arbitrary and capricious actions. *Decker v. State ex rel, Wyo. Med. Comm'n*, 2005 WY 160, ¶ 25, 124 P.3d 686, 694 (Wyo.2005); *Padilla v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2004 WY 10, ¶ 6, 84 P.3d 960, 962 (Wyo.2004).

[¶ 34] While the County Board's findings in this case are sparse and somewhat conclusory, we cannot conclude the County Board's decision was arbitrary or capricious under the circumstances presented here. The County Board's decision states Thunder Basin had the burden to overcome the presumption the County Assessor's value was correct and it failed to do so, a mere difference of opinion between appraisers was not sufficient to establish a valuation error, and the County Assessor's appraisal was consistent with the regulations and applicable law and relied on the best information available. True, it would have been helpful had the County Board specifically addressed Thunder Basin's argument concerning economic obsolescence. However, no doubt exists concerning the reasoning of the County Assessor's expert that the recent purchase obviated the need to do an economic obsolescence calculation. The County Board made a specific finding that the County Assessor's valuation was proper in all respects. Thus, it is clear from the record what the basis of the County Board's determination was on that issue.

[¶ 35] This situation is different from other cases where we have held an agency's decision to be arbitrary and capricious for failing to make sufficient findings of fact on evidentiary issues that are disputed. *See, e.g., Decker*, 2005 WY 160, ¶ 27, 124 P.3d at 694. We have said when there is disputed evidence on an issue, the hearing examiner must

make findings of basic facts upon all of the material issues in the proceeding and upon which its ultimate findings of fact or conclusions are based. Unless that is done there is no rational basis for judicial review.

* * * *

All of the material evidence offered by the parties must be carefully weighed by the agency as the trier of the facts; conflicts in the evidence must be resolved, and the underlying or basic facts which prompt the ultimate conclusion on issues of fact drawn by the agency in sustaining the prima facie case made, or in rejecting it for the reason it has been satisfactorily met or rebutted by countervailing evidence, must be sufficiently set forth in the decision rendered.

*Bush v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2005 WY 120, ¶ 9, 120 P.3d 176, 180 (Wyo.2005) (quoting *Pan Am. Petroleum Corp. v. Wyoming Oil and Gas Conservation Comm'n*, 446 P.2d 550, 555, 557 (Wyo.1968)).

*Id.* In the instant case, the County Assessor's expert testified the 1998 values represented fair market value and were, in the absence of some other indication of negative market influences, sufficiently current such that further economic obsolescence calculations, such as the income shortfall method, were unnecessary. Thunder Basin's position was simply that when such calculations are completed, some shortfall in income is seen and thus, some economic obsolescence has occurred. However, Thunder Basin's expert did not directly contest the County Assessor's position that reliance on reasonably current, arms length sales values was an appropriate

basis upon which to conclude no further economic obsolescence calculations were necessary.[3] Because the evidence upon which the County Assessor relied in concluding an economic obsolescence deduction was not appropriate was not contested, we hold the County Board's order was adequate to conduct our review. It would do little good to remand this matter in order for the County Board to state the obvious, e.g. it found the 1998 allocated value, derived from an arms length transaction and provided by the taxpayer, fairly included economic obsolescence in 2001.

### Case No. 05–118—Black Thunder Mine—Tax Year 2002

■ [¶ 36] Thunder Basin presents several issues in its appeal from the County Board's order affirming the County Assessor's valuation of the personal property at the Black Thunder Mine for the 2002 tax year. We must, however, question whether Thunder Basin had the right to appeal the SBOE's decision in the first instance and, thus, whether we have jurisdiction to consider this appeal. Issues of subject matter jurisdiction may be raised *sua sponte* at any time. *Scherer v. Schuler Custom Homes Const., Inc.*, 2004 WY 109, ¶ 10, 98 P.3d 159, 162 (Wyo.2004).

■ [¶ 37] "The right to judicial review of administrative decisions is entirely statutory, and agency actions are not reviewable absent statutory authority." *Brandt v. TCI Cablevision of Wyoming*, 873 P.2d 595, 597 (Wyo.1994), quoting *Casper Iron & Metal, Inc. v. Unemp. Ins. Comm'n*, 845 P.2d 387, 391 (Wyo.1993). *See also, Antelope Valley Improvement and Serv. Dist. of Gillette v. State Bd. of Equalization for the State of Wyoming*, 4 P.3d 876 (Wyo.2000). Wyo. Stat. Ann. §§ 39–11–102.1 and 39–11–109 (LexisNexis 2005) set forth the statutory requirements for appeals of tax determinations.

■ [¶ 38] A person who is adversely affected by the County Board's decision may appeal to the SBOE. Wyo. Stat. Ann. §§ 39–11–102.1(c) and 39–11–109. The SBOE hears appeals in its adjudicatory capacity. *Antelope Valley*, 4 P.3d at 878. "When the [state board] acts in its adjudicatory capacity, the [b]oard resembles a 'lower tribunal,' not an administrative agency." *Id.* After the SBOE issues its appellate decision, an "aggrieved person" may then appeal to the district court. Wyo. Stat. Ann. § 39–13–109; W.R.A.P. 12.01 *et seq.*[4]

■ [¶ 39] The concern we have in this case is the effect of the SBOE's remand to the County Board for further proceedings. Because the SBOE concluded the County Board's decision did not comply with law and remanded the matter for further proceedings, Thunder Basin was the prevailing party and was not, therefore, "aggrieved" under Wyo. Stat. Ann. § 39–13–102 and Rule 12 of the Wyoming Rules of Appellate Procedure. Moreover, the SBOE's remand order did not finally conclude the matter. As we stated many years ago in *Pub. Serv. Comm'n v. Lower Valley Power and Light, Inc.*, 608 P.2d 660, 661 (Wyo.1980):

> Generally a judgment or order which determines the merits of the controversy and leaves nothing for future consideration is final and appealable, and it is not appealable unless it does those things. 4 C.J.S. Appeal and Error § 94, p. 252. We conclude that the order of the district court was not designed finally to dispose of the matter but only to obtain additional information which should be considered by the commission in the first instance. No substantial rights of the commission were adversely affected by that order.

The order remanding the matter to the County Board for further proceedings did not finally determine the merits of the con-

---

3. We recognize that Thunder Basin's expert did testify the allocated sales price was not prepared for purposes of personal property tax. However, he did not contend that if a current, bona fide arms length sales price were available, further economic obsolescence calculations would still be necessary.

4. A county assessor is not an "aggrieved person" within the meaning of Wyo. Stat. Ann. § 39–11–109 and, consequently, may not appeal from a decision of the state board of equalization. *Brandt v. TCI Cablevision of Wyoming*, 873 P.2d 595, 597 (Wyo.1994).

troversy and, consequently, did not affect Thunder Basin's substantive rights.[5]

[¶ 40] Moreover, we held in *Bd. of Trustees of Mem'l Hosp. of Sheridan County v. Martin*, 2003 WY 1, ¶ 16, 60 P.3d 1273, 1277 (Wyo.2003), that "a judgment of the district court remanding an administrative proceeding to the agency for further proceedings is not an appealable order under W.R.A.P. 1.05." Thus, even if Thunder Basin's appeal from the SBOE to the district court was authorized, the district court's order remanding the matter to the County Board was, itself, not appealable. We, therefore, dismiss Thunder Basin's appeal in Case No. 05–118 for a lack of jurisdiction. In accordance with the SBOE's order, the matter remains remanded to the County Board for further proceedings.

### Case No. 05–119—Coal Creek Mine—Tax Year 2002

[¶ 41] Thunder Basin objected to the County Assessor's assessment of the Coal Creek Mine for the year 2002 raising similar issues as it did in 2001, e.g. the 1998 dates and values were improperly relied upon for physical depreciation calculations, the County Assessor improperly calculated economic obsolescence, and the findings were inadequate. The County Assessor used the same procedures for his 2002 assessment as he did in 2001 and consequently, our analysis above of those similar issues remains applicable in 2002.

#### New Issues

##### Physical Depreciation—1998 Values

[¶ 42] With regard to use of the allocated 1998 sales values, Thunder Basin raised two new arguments in 2002. First, it points to statements made in the Price Waterhouse

appraisal upon which the values were based as indicating they were not to be used for this type of purpose. The appraisal stated:

> The premise of Fair Market Value is applicable only for this engagement, and accordingly, our results should not be used for any other purpose. Further, the value reported does not represent the amount that might be realized from the sale of the individual assets on the open market or from their use for an alternate purpose.

However, it also stated:

> We define Fair Market Value as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of the relevant facts; (Estate Tax Regs., Sec. 20.2031–(9b); Rev. Rul. 59–60, 1959–1, C.B. 273). In estimating the Fair Market Value in Continued Use, we assumed that the subject property would continue to be part of the respective ongoing businesses, unless otherwise specified.

[¶ 43] On the basis of this language, Thunder Basin claims the Price Waterhouse appraisal, on its face, was not intended to establish fair market value of the property for personal property tax purposes and its reliance on continued use and not value in exchange was inconsistent with the applicable tax statutes. We find two problems with Thunder Basin's position. First, the 1998 values from the Price Waterhouse appraisal were provided to the County Assessor by Thunder Basin for the very purpose of establishing the company's book values to be utilized by the County Assessor in determining personal property tax valuations. It was not unreasonable for both the County Assessor and the County Board to rely upon that information as reliable and a disclaimer by

---

5. Thunder Basin maintains the SBOE exceeded its authority by providing an extensive analysis of the evidence in its remand order and, therefore, somehow poisoned the proceedings on remand. This argument presumes the SBOE cannot, in its appellate capacity, discuss the details of the County Board decision and state whether, in its opinion, that decision complies with law. In fact, that is precisely the role of the appellate body and often an appellate opinion, whether it be an administrative agency or a court, informs

the entity to which the remand is made. *See, Antelope Valley*, 4 P.3d at 878. Whatever decision is made upon remand will be subject to review and if the direction of the SBOE decision is ultimately found to be in error, those issues can be raised properly on appeal. The fact remains that because the matter has been remanded to the County Board, the taxpayer's substantive rights have not yet been adversely affected. We refuse to speculate on what actions the County Board will take upon remand.

the accounting firm, the obvious purpose of which was to limit its own liability, should not prevent them from doing just that. Second, despite Thunder Basin's attempts to inject confusion into the issue by reference to the concepts of continued use and use in exchange, the definition of fair market value used by Price Waterhouse bears a very close resemblance to that contained in both the statute and DOR rules. Wyo. Stat. Ann. § 39-11-101(a)(iv); DOR Rules, Ch. 9 § 4(f). Further, the SBOE cites to authorities which suggest when a property is utilized at its highest and best use, its value in use and its value in exchange are the same. *Property Assessment Valuation* 16 (International Association of Assessing Officers, 2d ed. (1996)). We see nothing in the Price Waterhouse appraisal which would have prevented the County Board from relying upon the information submitted to it by Thunder Basin as the book value of the property at issue. *See also, Guthrie,* 2005 WY 79, ¶ 14, 115 P.3d at 1092; *Airtouch Communications,* 2003 WY 114, ¶ 39, 76 P.3d at 357; *RT Communications,* 11 P.3d at 927.

[¶ 44] Second, in an effort to demonstrate use of the 1998 values resulted in an inaccurate valuation of the improvements, Thunder Basin presented the testimony of a local real estate appraiser who had compared the County Assessor's valuation of buildings on the mine property with its valuation of other commercial buildings in Campbell County and, on a per square foot basis, the latter values were much lower. The obvious purpose of this evidence was to demonstrate the County Assessor's valuations were not uniform and equal as required by law. However, the local appraiser admitted on cross-examination that the buildings he used for comparison were selected by Thunder Basin, none were located on mining property, and he did not attempt to find any similar mining buildings to include in his comparison. Given the problems in finding true comparable values in this situation, little weight can be given to Thunder Basin's effort to show the values resulting from the cost approach were inaccurate by comparing them to randomly selected buildings. Instead, the difference in the value of the improvements between the County Assessor's and Thunder Basin's ap-

praisals arose simply from the County Assessor's use of the 1998 value which resulted in fewer years of depreciation. As we previously discussed, that approach was not inconsistent with the statute or the regulations.

[¶ 45] We would also note the County Assessor's expert testimony in 2002 clarified that use of allocated sales data in the cost method for property tax purposes, such as was done in the case of the Coal Creek Mine, was typical and, in fact, had been used by the County Assessor to value personal property after the sale of at least three other Campbell County mines. Use of either the original cost data or an allocated purchase price was acceptable for purposes of the cost method. Even the County Assessor's expert testified that while his approach was an "accepted method," it was not the only one, and Thunder Basin's approach was also acceptable. The choice between the two was, therefore, a matter of appraisal judgment. *RT Communications,* 11 P.3d at 921. There was substantial evidence to support the appraiser's approach; consequently, we find no basis upon which to reverse the County Board's decision affirming the County Assessor's use of the 1998 values.

*Economic Obsolescence*

[¶ 46] The County Assessor calculated the economic obsolescence for the Coal Creek Mine to be 50%, whereas Thunder Basin claimed it was 64.06%. The County Assessor's expert concluded the personal property at the mine still had some value even though the mine was closed. To estimate that value, he averaged zero production when the mine was closed and 100% of production at full capacity and used the resulting 50% as his economic obsolescence factor. He testified this approach was justified in his appraisal experience and common practice throughout Campbell County in these kinds of situations. However, he did recognize that if a mine remained idle for a "lengthy period," he would revisit that value and reduce it further.

[¶ 47] Thunder Basin's expert, on the other hand, used the production shortfall method, which required that he determine the

production capacity of the mine. On the basis of publicly filed mine plans, he used a production capacity of 18 million tons per year even though the mine had never operated at that level. He then averaged the last three years of the mine's production and concluded it was operating at 18.16% of production capacity. Using a scaling factor, he determined the economic obsolescence was 64.06%. Had he used a different production capacity figure, such as 11 million tons which was the highest production at the Coal Creek Mine appearing in the record, his calculation would have resulted in a much lower percentage.

[¶ 48] The record discloses quite clearly the difference between the two economic obsolescence calculations was one of opinion. This was exemplified when the County Assessor's expert testified that Thunder Basin's 64.06% number was within the range of acceptable economic obsolescence, but "excessive." Differences of opinion are not a sufficient basis upon which to reverse the County Board's decision. *BP America Prod. Co. v. Dep't of Revenue*, 2005 WY 60, ¶ 26, 112 P.3d 596, 608 (Wyo.2005); *Teton Valley Ranch v. State Bd. of Equalization*, 735 P.2d 107, 113 (Wyo.1987). We conclude there was substantial evidence to support the County Assessor's economic obsolescence calculation for the Coal Creek Mine in 2002.

*Adequacy of County Board's Findings and Conclusions*

[¶ 49] As it did in the 2001 case, Thunder Basin complains the County Board's findings and conclusion are insufficient to explain the reasons for its decision and allow for adequate judicial review. We disagree.

[¶ 50] The County Board's findings for the Coal Creek Mine in 2002 detailed the valuation methods used by the two appraisers and compared those methods with the requirements of the statute and regulations. They noted the County Assessor was relying upon the information provided by Thunder Basin and utilized a residual value of 30% which was within the 25% limit provided by the regulations. The County Board explained the County Assessor's approach of relying upon updated booked costs when a

sale occurred was the approach used for all mines in Campbell County. With regard to economic obsolescence, the findings explained how the County Assessor's expert calculated the utility of an idle asset and found that approach was a generally accepted appraisal method.

[¶ 51] The County Board also carefully outlined the approach taken by Thunder Basin's expert, noted the information provided to him was different than that available to the County Assessor, and found the residual values he used were below those allowed by the regulations. Regarding the residual values, the County Board specifically found insufficient information had been submitted to vary from the 25% limit in the regulations and to do so would result in unequal treatment of other mining properties in Campbell County. Finally, the County Board concluded, after explaining both parties used acceptable appraisal methods, the differences were primarily the result of differing professional opinions and Thunder Basin had failed to overcome the presumption the value assigned by the County Assessor was valid and correct. *BP America Production Co.* 2005 WY 60, ¶ 26, 112 P.3d at 608; *Teton Valley Ranch*, 735 P.2d at 113. We conclude the County Board's findings and conclusions adequately explain its decision.

**CONCLUSION**

[¶ 52] The County Board had an adequate basis upon which to determine, in Cases Nos. 05–117 and 05–119, the County Assessor used a rational appraisal method, equally applied to all property, when he valued Thunder Basin's personal property at both mines in 2001 and at the Coal Creek Mine in 2002. Applying the appropriate standard of review, we conclude there is no basis in the record upon which to reverse the County Board and, therefore, affirm. With regard to Case No. 05–118, we conclude the matter is not properly before this Court because it was remanded to the County Board by both the SBOE and the district court. Those orders were not appealable under W.R.A.P. 1.05, and the appeal is, therefore, dismissed for lack of jurisdiction.

[¶ 53]  Affirmed in part and dismissed in part.