# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 57

APRIL TERM, A.D. 2013

*May 10, 2013*

JOHN LESLIE CHAPMAN,

**Appellant**
**(Defendant),**

**v.**

S-12-0085

THE STATE OF WYOMING,

**Appellee**
**(Plaintiff).**

*Appeal from the District Court of Sweetwater County*
*The Honorable Nena James, Judge*

*Representing Appellant:*
    Elisabeth M.W. Trefonas, Assistant Public Defender

*Representing Appellee:*
    Gregory A. Phillips, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Theodore R. Racines, Senior Assistant Attorney General; Jeffrey Pope, Assistant Attorney General

*Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**DAVIS**, Justice.

[¶1]    Appellant John Chapman was initially charged with attempted first degree murder and conspiracy to commit first degree murder after he allegedly shot a man he believed to have assaulted his fiancée.  He was later charged with aggravated assault with a request for habitual criminal enhancement to life in prison based on the same event.

[¶2]    Chapman pled guilty to a reduced charge of attempted second degree murder in an oral plea agreement which provided for dismissal of the conspiracy  and aggravated assault charges.  He was sentenced to a term of twenty-five to fifty years in accordance with the plea agreement.  The district court ordered restitution but waived reimbursement of public defender fees.

[¶3]    Chapman later moved to withdraw his plea, claiming that his attorney conspired with the court, misled him about the term he would serve, and otherwise coerced him into pleading guilty.   After an evidentiary hearing, the court denied the motion.  Chapman timely appealed the decision denying the motion to withdraw his guilty plea, claiming that the court abused its discretion in denying it.  He also claimed in this appeal that the district court abused its discretion in awarding restitution.

[¶4]    We find that the district court reasonably concluded that Chapman failed to demonstrate the manifest injustice required to allow him to withdraw his guilty plea.  We find that our review of the restitution issue is limited by Chapman's failure to timely appeal the award, and that the district court had authority to make the award it did.  We therefore affirm.

## ISSUES

[¶5]    1. Did the district court abuse its discretion when it denied Chapman's motion to withdraw his guilty plea?

2. Did the district court have authority to award restitution and waive reimbursement of public defender fees?

## FACTS

[¶6]    In October of 2008, the State filed an Information charging Chapman with attempted first degree murder.  The Information was soon amended to add a charge of conspiracy to commit first degree murder.  The State later charged aggravated assault and battery based on the same facts in a separate Information.  It gave notice of its intent to seek sentence enhancement as a habitual criminal on the assault and battery charge under Wyoming Statute § 6-10-201.  Each of the charges exposed Chapman to  life

1

imprisonment if he was convicted. *See* Wyo. Stat. Ann. §§ 6-2-101(b), 6-10-201(b)(ii) (LexisNexis 2009). The two cases were consolidated for trial.

[¶7]    The probable cause affidavit supporting the Information in each case alleged that Chapman's fiancée told him that she had been "hurt" by the victim of the shooting. The affiant claimed that the fiancée showed Chapman where the victim lived, and that the couple then drove to a gun show where the fiancée purchased a Remington .270 rifle with which she intended to shoot her alleged abuser. On September 28, 2008, the couple drove to the victim's residence and waited for him to come home. When he did, Chapman drove next to the victim's vehicle and shot him in the face. A bystander who witnessed the incident identified Chapman as the shooter. The victim survived, but sustained major injuries to the right side of his face, jaw and neck.

[¶8]    At his arraignment in district court, the district judge advised Chapman of his rights as required by Wyoming Rule of Criminal Procedure 11(b), including his right to plead not guilty and to proceed to trial. The court repeatedly asked Chapman if he had questions about his rights, and he responded that he did not. He pled not guilty to both charges.

[¶9]    Chapman also pled not guilty to the assault charge at a separate arraignment held almost a year later. The same district judge again advised him of his rights, including his right to a jury trial, and he once again indicated that he understood his rights.

[¶10]   The case proceeded slowly as Chapman expressed repeated dissatisfaction with public defenders appointed to represent him. He claimed that one of his public defenders pressured him to plead guilty, which he did not wish to do, and new counsel was therefore assigned. Chapman was evaluated at the Wyoming State Hospital at the request of his second appointed public defender, which resulted in further delay. He was assessed competent to stand trial. A third public defender ultimately became involved in the case to assist the second appointed public defender.

[¶11]   Although he initially expressed satisfaction with the second and third public defenders, Chapman eventually became disgruntled and retained a private attorney with financial assistance from his mother. Private counsel entered an appearance on January 6, 2010. At a January 25 hearing on a motion for continuance, Chapman complained that his public defenders had done "nothing . . . so far on my behalf. That is why I went to a private attorney."

[¶12]   Replacement counsel promptly moved for a continuance of a trial then set to begin on March 2, 2010, arguing that the charges against Chapman were sufficiently complex that he could not adequately prepare to effectively try the case on that date. The trial was rescheduled to begin on June 28, 2010 by an order entered on January 27, 2010. Waivers of speedy trial had already been filed at various times during the pendency of the case.

2

[¶13]  After learning that private counsel had been retained, the public defenders still assigned to the case moved to withdraw and for an order awarding public defender fees on January 19, 2010.  The court set a hearing on that motion on January 29, but was forced to reschedule it because all of the involved attorneys did not appear at the appointed time, evidently due to a misunderstanding as to whether the pending issue had been resolved by stipulation.  The district judge observed at the aborted hearing that Chapman had refused to come out of his jail cell to attend.  The hearing was rescheduled to February 5, 2010.

***Change of Plea***

[¶14]  Before the rescheduled hearing on public defender fees began on February 5, the court was advised that Chapman wished to change his plea.  The district judge noted after calling the case that "It is my understanding that we are here today because there is a plea agreement, we are anticipating a plea from you on the basis of that plea agreement. Is that your understanding?"  Chapman replied, "Yes, ma'am."

[¶15]  As already discussed, the court had previously advised Chapman of his rights on two prior occasions because the two cases now before it had originally been filed separately.  The trial judge referred to the two prior advisements, and asked if Chapman understood his rights.  He replied that he did.

[¶16]  Despite this assurance, the court advised Chapman of the nature of the original charges against him as well as the penalties for attempted first degree murder, conspiracy to commit first degree murder, and aggravated assault.  The effect of the habitual criminal enhancement was also explained–if the State could prove its case on this point, Chapman faced the possibility of life imprisonment on that charge as well as on the attempt and conspiracy charges.   The court also advised Chapman of the consequences of a guilty plea, including that he "would be giving up the right to the presumption of innocence, the right to remain silent, the right to do a trial, the right to be confronted by witnesses and to cross-examine those witnesses, and the State wouldn't have to prove any allegation against you."

[¶17]  Chapman indicated that he understood the consequences of a guilty plea, that his plea was voluntary and that he was satisfied with his current attorney's representation:

> THE COURT:  . . . . Do you understand the consequences of a guilty plea?
> THE DEFENDANT: Yes, ma'am.
> THE COURT: Are you ready to plead today?
> THE DEFENDANT: Yes, ma'am.
> THE COURT: Will your plea be entered voluntarily?

THE DEFENDANT: Yes, Ma'am.
THE COURT: Has anyone forced, threatened or promised you anything outside of a plea agreement?
THE DEFENDANT: No, Ma'am.

.    .    .

THE COURT: Have you talked with [your attorney] about this case in general and the plea that it is anticipated that you will be entering today?
THE DEFENDANT: Yes, ma'am.
THE COURT: Are you satisfied with his representation of you so far?
THE DEFENDANT: Yes, ma'am.

[¶18] Defense counsel then described the plea agreement. The State would amend the Information charging attempted first degree murder and conspiracy to commit first degree murder to one count of attempted second degree murder and recommend a sentence of twenty-five to fifty years on the reduced charge. Chapman would consent to the amendment, waive any right he might have to a preliminary hearing, and plead guilty to the amended charge. The conspiracy and aggravated assault charges on which the State sought habitual criminal enhancement would both be dismissed.

[¶19] Chapman would also stipulate to the amount of public defender fees incurred before he retained private counsel, as well as to the amount of restitution required to pay the victim's medical bills. However, his counsel would be free to argue that he was financially incapable of paying the public defender fees or restitution, while the State was free to argue that he was able to pay both.

[¶20] After hearing the terms of the plea agreement, the district court addressed Chapman again, and established that he understood the agreement, that he consented to the amendment of the Information, that he waived any right to a preliminary hearing on the amended charge, and that he wanted to proceed to sentencing that day. The presentence investigation required by Wyoming Rule of Criminal Procedure 32(a) had been completed early in the case, and so it was not necessary to wait for it to be compiled to proceed to sentencing if Chapman did in fact plead guilty.

[¶21] The district judge explained the elements of second degree murder, noting that the elements of attempt were the same for the amended charge as for the original charge. She also explained the minimum and maximum penalties for attempted second degree murder, which were a minimum of twenty years and a maximum of life in prison. After hearing the explanation, Chapman asked for further clarification and then expressed his understanding of what he had been told. The judge asked him again if he understood his

4

constitutional rights, which she noted were the same as for the original charges, and he said that he did. When asked if he had any questions, he indicated that he did not.

[¶22] Chapman pled guilty and testified under oath to a factual basis to support the plea. He generally corroborated the allegations of the probable cause affidavit described above. However, the affidavit indicated that he told a Rock Springs police officer that he was holding the rifle at the time of the shooting, but that someone "yelled, causing him to 'jerk' at which time the gun 'went off.'" This could of course indicate that he did not intend to shoot the victim.

[¶23] In his testimony as to the factual basis for his guilty plea, Chapman stated unequivocally that he took the rifle in question from his fiancée and shot the victim on purpose–that he "meant to shoot him, yeah." The record reflects no prompting by or off-the-record conferences with defense counsel during his testimony as to the factual basis, suggesting that Chapman's responses were spontaneous.

[¶24] After taking the factual basis, the court found that Chapman was mentally alert, capable of understanding the proceedings, and competent to enter the plea. It also found that the plea was knowingly and voluntarily made, "and not the result of force or threats or promises apart from a plea agreement." It determined that Chapman had been properly advised as required by W.R.Cr.P. 11, that he understood those advisements, and that "the plea was made after consultation with competent counsel, with whom the Defendant is satisfied, without any improper inducement or conditions, with an understanding of the charge and the direct consequences." After making these findings, the court accepted the guilty plea and dismissed the aggravated assault and conspiracy to commit first degree murder charges as called for by the plea agreement.

[¶25] The court then proceeded immediately to sentencing, first correcting a minor error in the presentence investigation report which Chapman and his attorney agreed was otherwise accurate. Neither attorney made an argument concerning the sentence, although they argued their respective positions regarding restitution.

[¶26] As agreed, defense counsel did not dispute that the amounts of restitution or public defender fees were reasonable, but asked the court to find that Chapman was unable to pay either because he would be incarcerated. The State argued that restitution was appropriate given the victim's significant medical expenses. The prosecuting attorney did not specifically address whether Chapman should be ordered to pay public defender fees. Before pronouncing sentence, the court asked, "Mr. Chapman, is there anything that you would like to say to the Court at this time or do you know of any reason why this Court should not proceed to sentence you?" Chapman replied, "No, ma'am."

[¶27] The court sentenced Chapman to a term of imprisonment of not less than twenty-five years nor more than fifty years with credit for time served while awaiting trial, as

5

called for by the plea agreement. It waived reimbursement of public defender fees but awarded $76,589.19 in restitution for the expenses the victim and his health care providers incurred as a result of the shooting. A written judgment and sentence was entered four days later on February 9, 2010.

*Plea Withdrawal Hearing*

[¶28] On February 11, 2010, six days after he changed his plea and was sentenced, Chapman filed a handwritten motion to withdraw his guilty plea.[1] He alleged that his plea was the result of duress imposed by his attorney, and specifically that "all the stress at the time & being told if I did not take the plea deal I would be getting life in prison . . . take the deal now or do life. I feel I was forced into it." He claimed that he had lied when he provided a factual basis for the plea, and that Lesley Stevenson, his mother, "was in the room [when he discussed a plea agreement with his attorney] and feels the same way I do."

[¶29] After this motion was filed, Chapman's private attorney withdrew, citing a potential conflict of interest based on the likelihood that he would become a witness. An evidentiary hearing on the motion was not held until August 25, 2011, well over a year later, due to delays in resolving a request by Chapman to represent himself, followed by appointment of a public defender (his fifth attorney in the case). The involvement of numerous attorneys also made it difficult and time-consuming for replacement counsel to locate evidence and transcripts in the hands of prior attorneys. Replacement counsel was also permitted to conduct discovery related to the motion.

[¶30] When the August 25 hearing began, counsel advised the court of a written stipulation that the county attorney's office had notified the victim that plea negotiations were taking place about one week before the February 5, 2010 hearing, and that he was notified on the morning of February 5 that Chapman would change his plea that day. He was present in the courtroom when Chapman entered his plea.

[¶31] Lieutenant Crystal Valenciano of the Sweetwater County Sheriff's Office testified when called by the defense that she was a supervisor in charge of inmate transports at the detention center in Rock Springs on February 5, 2010. She scheduled Chapman to be brought to the courthouse in Green River that day at about 9:00 a.m., but she did not find out that he needed be brought over until that same morning. This was unusual, because she typically learned about transports a week in advance. It is unclear what significance this testimony was intended to have, as Chapman was already scheduled for a hearing on the public defender's motion to withdraw and for an award of fees that morning.

---

[1] The motion was dated February 10, 2010, a day earlier.

[¶32] The defense then called Chapman's former private attorney. He testified that there was no plea agreement when he entered his appearance. He knew that Chapman was upset with his previous lawyers, but testified that he "never became aware that [Chapman] was dissatisfied with his other lawyers because they were pursuing plea negotiations." He asked the court for a continuance of the March 2010 trial date on January 25, 2010 because he needed to review discovery and prepare for trial. He did not recall whether he talked to the prosecutor between January 25 and February 5.

[¶33] The retained attorney testified that he anticipated an important discussion about resolving the case on February 5, the date of the hearing on public defender fees, although he was not asked why he believed this would occur. He requested that Chapman's mother Lesley Stevenson be present, and she drove through the night from Washington State to be there. He met with Chapman and his mother in the jail in Rock Springs for thirty to forty-five minutes that morning. No plea negotiations had taken place up to that point in time.

[¶34] The meeting at the Rock Springs jail was interrupted by staff who advised Chapman and his attorney that he had to be taken to the courthouse in Green River with other prisoners who had proceedings scheduled in district court that morning. The attorney arranged for Ms. Stevenson to follow him to the courthouse in her vehicle, and then discussed resolution of the case with the prosecutor. At some point, he notified the court that "if we could have some additional time we might be able to make progress resolving the case."

[¶35] The retained attorney testified that he then met with Chapman and his mother at the courthouse to discuss a possible plea agreement. The attorney said that Chapman told him, "[L]ook, if you can get me a bottom number of 25 [years] I would do that." He advised Chapman that he could file a motion for sentence reduction late into his first year of incarceration, but warned him that the decision as to whether to grant a sentence reduction would be entirely in the court's discretion. He also spoke of Department of Corrections/Board of Parole administrative good time, but he did not recall discussing whether Chapman would be eligible for placement at an adult community corrections facility, as Chapman later claimed they had. He was unsure how much time they spent discussing a possible change of plea. He remembered talking with his client about the necessary factual basis to support a plea, and how "there would be no other charges" filed with regard to the victim in this case.

[¶36] On cross-examination by the State, the attorney clarified that he does not always recommend plea agreements to clients facing potential life sentences, but that he instead leaves the decision as to whether to plead or go to trial to them after they have assessed the risks of each choice. He testified that the prosecutor was willing to recommend a term of twenty-five to fifty years if Chapman would change his plea that day, which was

7

acceptable to Chapman. He believed that a plea bargain was in Chapman's best interest, and he specifically told him that he could either negotiate a plea or go to trial.

[¶37] He also told Chapman that he would receive good time if he met the administrative requirements, although he cautioned him that good time was discretionary and that he should view his sentence as one of at least twenty-five years. He did not discuss the specific effect of good time on the actual length of the minimum sentence, and likewise did not tell Chapman that he would receive a sentence reduction or that he would serve only six years if he did, as Chapman claimed.

[¶38] The defense next called Dr. Carlos Garcia-Prieto, an attending adult psychiatrist at the Wyoming State Hospital, as an expert witness. His forensic evaluation of Chapman yielded the following diagnoses: substance abuse including poor impulsive disorder and antisocial personality disorder, and adjustment disorder with disturbances of emotion and conduct, which is one of the most common psychiatric disorders. Dr. Prieto explained that, in his experience as a psychiatrist, not being forthright and honest with a person like Chapman may lead him to be uncooperative, make bad decisions, and even become violent.

[¶39] Chapman also testified. He had been unhappy with his appointed public defenders because "[t]hey were more interested here, as they do in Wyoming, they plea bargain everything out." He retained the private attorney because of his reputation as a trial lawyer, and also because the attorney told him that he would take the case to trial. He specifically told his new lawyer that he wanted to go to trial. He testified that he made it "very clear" that there were to be no plea bargains when he met with counsel on January 25. He denied giving his attorney authority to enter into plea negotiations. Chapman testified that the two talked by phone on February 2 to discuss discovery and the request for reimbursement of public defender fees, but that they did not discuss plea negotiations at that time.

[¶40] Chapman testified that his attorney and his mother showed up at the jail in Rock Springs at 7:50 a.m. on February 5. They all met briefly, but did not discuss plea negotiations at that time. He was transported to Green River at approximately 9:00 a.m.[2]

---

[2] Chapman gave inconsistent testimony as to the length of the meeting:

> Q. [New public defender] John, I just want to be clear. You are saying to me that it [the meeting] was about ten minutes?
> A. Yeah, ten minutes.
> Q. But I also heard you say that it was shortly after 8:00. So which is it?
> A. No, it was ten minutes, ten minutes to 9:00. Sorry if I wrecked that. It was 8:50 when they called me out of my cell to come down to the front room.

8

Chapman anticipated a hearing which would only deal with the pending request for public defender fee reimbursement. He described what happened next as follows:

> When I got here to the courthouse I -- I was told I was here -- [my attorney] came in and he said that I had waived my right to a trial. I told him a speedy trial. He said I -- no, we are not going to get into all that. The judge is expecting for you to do a plea. The district attorney is here. The victim is here, the witnesses. We have your wife on -- at Lusk on the intercom. The judge is willing to work with her, if you are willing to work with the judge. Right now she is willing to work with you, otherwise you are going to be sentenced today. So I would advise you to take a plea bargain. He said I have already spoke to the judge and I have spoke to Ms. -- he said I spoke to [the deputy county attorney]. And [the county attorney] is on his way over right now to do this. He says, ah you know, this is what is going on. I told him -- at that time regarding to the room, it was pretty long and lengthy in the room. We spent probably two hours of him going in and out. And I told him at the time just take me back to the jail. I am done with you, man. I'm done with you. I don't want a plea bargain. I told you that at the beginning. He said it's not up to me, that right had been taken away, and that I was here to be sentenced.

Even though Chapman acknowledged that his attorney spent two hours going back and forth between the witness room where he waited and the county attorney's office, he claimed not to know why his attorney would be making these mysterious peregrinations.

[¶41] Chapman testified that the judge indicated that the change of plea caught her off guard. He also testified without objection that he believed that the victim had been notified at 9:00 that morning that a change of plea would take place, which was consistent with the stipulation in the record. He also testified to the following:

> Q. Okay. When you got to the courthouse and you went in to the visiting room there what were your -- how did the discussion begin with [your attorney]?
>
> A. He came in. He said -- okay. My mom was sitting in the room. He walked in a little after I sat down. He said, hey, give me a minute, I'll be right back. He came back to the room. He said look. He said I just spoke to the judge and to the district attorney, they are here. You are going to be

sentenced today. I told him at that time, I said no, I said I'm going to trial. I'm not doing the sentence. He said no, look, there is not going to be a trial. I just spoke with the judge and district attorney and they are going to sentence you today. Now, the judge has offered you the deal that has been on the table. She is willing if you be cooperative right now because she is tired of all this. She favors you a little bit so she is all right. So if you are willing to take this deal right now I advise you to take this deal right now, which is he came in with a number of 30 to 50 is the first number he came at me with, said that he had on the table that he was going to negotiate with.

.    .    .

His exact words, you are not leaving here today until you are sentenced, you are here to be sentenced now. The judge is willing to work with you. Not the DA, the judge. He said the judge was going to work with me, she was going to let me have the deal, it was still on the table if I cooperate and take it right now. That was his -- that was his thing. I told him no, you go tell the judge I want my trial. He left the room and came back. He said no, the judge isn't going to do that. I said go tell the judge to take me back to jail because I am not doing a plea bargain.

Chapman indicated that he repeatedly asked his attorney for more time to obtain a written plea agreement and to study it, but his attorney insisted that he would be sentenced that day. He claimed that his lawyer told him that his options were either to take "the deal" (of twenty-five to fifty years) or be sentenced to life that same day.

[¶42] He also indicated that his attorney told him that he would receive a credit of fifty percent good time against his minimum sentence, and that there would be no federal prosecution as a result of the plea agreement.[3] He claimed that he was told that he would only serve a total of six years in prison:

[A]s a matter of fact, he spoke with the judge, he had done some other deals with the judge and the judge had -- you know, it [was] all back to the judge, of course, according to him. That he had spoke with the judge and . . . the judge said

---

[3] The record is silent as to what federal charges might have been brought. It is clear that Chapman was a convicted felon, however, and he might therefore have been subject to a federal charge of being a felon in possession of a firearm at the time of the shooting. *See* 18 U.S.C. 922(g) (2012).

that if we would just settle this since it was so long and it had been so much and so much confusion. If would just satisfy the victim right now with this number, she was willing to do a sentence reduction, take 15 off the top, five off the bottom. Now that's pretty good because I'm only doing 50 percent with the credits for my time served. That is ten years for credit of time served. I am three years down. That only gives you six to six and a half years and you can do that [at a community correction facility], yeah.

In response to questions about the specific language that his attorney had used, Chapman claimed that "I have got [sic] a photographic memory. I can repeat just about anything over time."

[¶43] Chapman testified that although he believed that he would only serve six years after entering his plea on February 5, he realized this was incorrect after talking to other inmates and doing legal research at the jail's law library. He felt that his lawyer provided false and misleading information, and indicated that at the time he changed his plea he believed that he had waived his right to a trial and would be sentenced that day regardless of whether he entered into a plea agreement because that is what his lawyer told him. He felt pressured, coerced, manipulated, and that he had no control over the situation.

[¶44] On cross-examination, Chapman testified that he was upset with all of his previous attorneys because they wanted him to enter into a plea agreement when he just wanted to go to trial. He believed that his retained attorney had "manipulate[ed] the system for two hours," referring to the time period during which plea negotiations were taking place. He admitted that he was familiar with the legal system and that he knew he had a choice between pleading guilty and going to trial based on past experience. However, he still claimed that he was told that he had no choice but to take the plea agreement and plead guilty, or go to prison for life without a trial. He testified that he lied to the court about understanding his rights, about entering a voluntary plea, and about the factual basis he gave.

[¶45] The defense next called a records manager for the Wyoming Department of Corrections. She testified that "good time" typically reduces a well-behaved inmate's minimum term by one-third and his or her maximum term by one-quarter because it only applies to time actually served. She also testified that it is common for attorneys and inmates alike to believe that good time results in a fifty percent reduction in a minimum sentence, but that the system does not in fact work that way.

[¶46] Chapman called his mother Lesley Stevenson as his final witness. She testified that she paid to retain replacement counsel because he was willing to take the case to trial as her son wished to do. The attorney contacted her at some point before February 5 and

told her it was "imperative that [she] be there" for the February 5 hearing, and she therefore drove overnight through a blizzard from Idaho to Rock Springs despite the fact that she was recovering from pneumonia.

[¶47] She met with her son and counsel at the jail that morning, and Chapman did not authorize his attorney to negotiate a plea at that meeting. She traveled to the courthouse in Green River after the detention center staff took her son there. She was present when counsel and her son met at the courthouse. Her son's attorney told him that the prosecutor had offered to recommend a term of thirty to fifty years. She said that Chapman "absolutely exploded and said no way." She testified that Chapman said that the numbers would need to be "really low" but explained that what he really wanted was to go to trial. The attorney left and came back with the offer of twenty-five to fifty years, which Chapman refused.

[¶48] Ms. Stevenson claimed that counsel then told Chapman that he would be sentenced that day, and that his only choices were to plea bargain or receive a life sentence. Chapman argued with his lawyer, and counsel then told him that he would only serve six to eight years at a work camp after receiving a sentence reduction. Chapman asked for more time to consider his options, to which the attorney replied, "You can take what the prosecutor is offering or you can get sentenced to life. . . . [T]his is a one time right now deal." She testified that the attorney "emphatically said if we didn't take the plea bargain he was going . . . to be sentenced for life," and she "still didn't understand why we couldn't have a trial."

[¶49] Ms. Stevenson testified that her son's attorney had provided him false and misleading information. She recorded her recollection of the events of that day in a letter written after the private attorney was discharged. The letter was received into evidence at the hearing, and stated as follows:

> [The attorney] finally was able to talk the prosecutor down to 25 to 50 years, which he explained meant that John would only be in prison for about 16 years if he made the plea right now.

[¶50] The State called no witnesses. The court found that Chapman had failed to prove that manifest injustice would result if he was not allowed to withdraw his plea for reasons discussed below. It therefore orally denied the motion, and subsequently entered a written order confirming that decision on September 22, 2011.

[¶51] On October 19, 2011, Chapman filed a notice of appeal of the written September 22, 2011 order denying his motion to withdraw the guilty plea and to the judgment and sentence entered on February 5, 2010.

**STANDARD OF REVIEW**

[¶52] We review the denial of a motion to withdraw a guilty plea for an abuse of discretion, meaning that "we must determine whether the trial court could reasonably conclude as it did and whether any facet of its ruling was arbitrary or capricious." *Dobbins v. State*, 2012 WY 110, ¶ 53, 298 P.3d 807, 821–22 (Wyo. 2012) (quoting *Kruger v. State*, 2012 WY 2, ¶ 26, 268 P.3d 248, 254 (Wyo. 2012)). *See also Jackson v. State*, 2012 WY 56, ¶ 6, 273 P.3d 1105, 1107 (Wyo. 2012) (citation omitted); *Follett v. State*, 2006 WY 47, ¶ 19, 132 P.3d 1155, 1162 (Wyo. 2006) (citing *Ingersoll v. State*, 2004 WY 102, ¶ 19, 96 P.3d 1046, 1051–52 (Wyo. 2004)). The trial court's findings of fact are reviewed to determine whether they are clearly erroneous. *Palmer v. State*, 2008 WY 7, ¶ 11, 174 P.3d 1298, 1301 (Wyo. 2008) (citing *McCard v. State*, 2003 WY 142, ¶ 8, 78 P.3d 1040, 1043 (Wyo. 2003)). When reviewing a decision to determine whether it is clearly erroneous:

> [W]e assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

*Harber v. Jensen*, 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo. 2004). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed after examining all of the evidence. *BJ Hough, LLC v. City of Cheyenne*, 2012 WY 140, ¶ 8, 287 P.3d 761, 764 (Wyo. 2012) (citation omitted).

[¶53] Wyoming Rule of Appellate Procedure 2.01 provides as follows:

> An appeal from a trial court to an appellate court shall be taken by filing the notice of appeal with the clerk of the trial court within 30 days from entry of the appealable order . . . .

W.R.A.P. 2.01(a). This requirement is both mandatory and jurisdictional, meaning that "[t]he failure to timely file a notice of appeal deprives this Court of jurisdiction to hear the appeal." *Yeager v. Forbes*, 2003 WY 134, ¶ 14, 78 P.3d 241, 247 (Wyo. 2003) (citation omitted); *see also* W.R.A.P. 1.03. Moreover, "when a party fails to timely appeal an appealable order [as defined by W.R.A.P. 1.05], he cannot raise the issues decided in the order in a subsequent appeal." *Cook v. Swires*, 2009 WY 21, ¶ 10, 202 P.3d 397, 400 (Wyo. 2009) (citation omitted). The existence of subject matter jurisdiction is a question of law that may be raised *sua sponte* at any time. *Id.*; *Thunder Basin Coal*

*Co. v. Campbell Cnty.*, 2006 WY 44, ¶ 36, 132 P.3d 801, 813 (Wyo. 2006) (citing *Scherer v. Schuler Custom Homes Const., Inc.*, 2004 WY 109, ¶ 10, 98 P.3d 159, 162 (Wyo. 2004)).

## DISCUSSION

### *Plea Withdrawal*

[¶54]  Wyoming Rule of Criminal Procedure 32(d) provides as follows:

> (d) *Plea withdrawal*. -- If a motion for withdrawal of a plea of guilty or nolo contendere is made before sentence is imposed, the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason.  At any later time, a plea may be set aside only to correct manifest injustice.

W.R.Cr.P. 32(d).  Rule 32(d) does not impose a time limit for the filing of a post-sentence motion to withdraw a guilty plea.  However, we have held that a motion to withdraw a guilty plea must be filed within the time for filing a notice of appeal.  *Nixon v. State*, 2002 WY 118, ¶¶ 13–14, 51 P.3d 851, 854 (Wyo. 2002).  Chapman filed a motion to withdraw his guilty plea just two days after a judgment and sentence was entered, well within the thirty days allowed by Wyoming Rule of Appellate Procedure 2.01.  Although his motion was not decided for approximately twenty months, the Rules of Criminal Procedure do not impose a time limitation as they do for certain types of post-trial motions, and we are therefore able to reach the merits of this issue.

[¶55]  Chapman argues that his plea was involuntary because his attorney made misrepresentations or gave bad advice on which he relied.  He claims that three separate misrepresentations induced him to plead guilty: (1) that he would serve substantially less time than he actually would before being eligible for parole due to good time allowances and a sentence reduction; (2) that he must accept a plea agreement and enter a guilty plea to a lesser charge or receive a life sentence without a trial; and (3) that federal charges would not be filed because there would be a notice of *nolle prosequi*[4] from federal authorities.  He contends that he would have gone to trial if he had not been misled.

[¶56]  The State responds that the district court properly exercised its discretion and reasonably concluded that Chapman's claims were not credible.  It contends that the calm and relaxed demeanor of Chapman observed by the district judge at the change of plea hearing was inconsistent with his subsequent claim that he was pressured and coerced to

---

[4] A legal notice that a prosecutor has abandoned an action.  Black's Law Dictionary 1147 (9th ed. 2009).  Chapman seemed to be more familiar with this term than anyone else involved in the case.

enter a guilty plea. The State also points to Chapman's statements that he understood his rights, which would be inconsistent with his claim that he was convinced that he no longer had a right to a trial.

[¶57] Rule 32(d) of the Wyoming Rules of Criminal Procedure provides that the trial court may allow a defendant to withdraw a guilty plea after sentencing only upon a showing that manifest injustice would result if he is not allowed to do so. "Manifest injustice contemplates a situation that is unmistakable or indisputable, was not foreseeable, and affects the substantial rights of a party. [The rule] is, in part, intended to address a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *Follett*, ¶ 19, 132 P.3d at 1161 (quoting *Ingersoll*, ¶ 19, 96 P.3d at 1051). The district court concluded that Chapman did not make the required showing. As noted above, we review the trial court's findings of fact to determine whether they are clearly erroneous, and its decision for an abuse of discretion. *See Palmer*, ¶ 11, 174 P.3d at 1301 (citing *Ingersoll*, ¶ 12, 96 P.3d at 1050; *McCard*, ¶ 8, 78 P.3d at 1043).

[¶58] The court indicated that it was not convinced that coercion took place, or that representations were made without authority. The judge did not find the circumstances surrounding the plea agreement to be as suspicious as Chapman claimed they were. She noted that "just because [the private attorney] conveyed an offer that was made by the State, doesn't mean that he represented that he had authority to settle the case." The court likewise found nothing coercive about the fact that defense counsel explained the factual basis required to support a plea to attempted second degree murder, pointing out that sometimes defendants want to plead guilty but balk at actually admitting guilt, and therefore fail to provide the required factual basis. The court also observed that many hearings get changed from one purpose to another at the last minute, and that "[t]he fact that this deal was made quickly is not per se evidence that it was done in an improper way."

[¶59] The court also found that Chapman had "some serious credibility issues," noting that his testimony "speaks for itself today. I just kind of sat and let him go on and on. It got more incredible as it went along. . . . I got to hear about his photographic memory. I find his testimony to have been less than credible, especially in view of the self-interest that he has in the outcome of this hearing." The court declined to comment on the credibility of counsel, explaining that he was an officer of the court, and that it was "incredible to really believe that he said that you are getting sentenced no matter what, the judge has already agreed, the judge owes me some favors." The court further observed that Ms. Stevenson seemed credible, but that she presented conflicting testimony about both the discussion of a minimum term of years and the length of her drive to Rock Springs.

15

[¶60] Finally, the district judge observed that she had firsthand knowledge of the change of plea hearing. She indicated that she was not manipulated by defense counsel as Chapman alleged. She did not find out about the change of plea until 11:00 a.m. on February 5, when her judicial assistant told her that Chapman had decided to change his plea, and she had no contact with any of the attorneys before then. The judge indicated that she was vigilant and observant during the change of plea hearing. She intentionally engaged Chapman in dialogue, and she asked him several times if he understood his rights or had any questions. At one point, Chapman asked her a question that "indicated clearly that he understood what was going on."

[¶61] She observed that Chapman remained relaxed and calm throughout the change of plea proceeding. There was no visible indication of any conflict between client and counsel, and Chapman's demeanor never suggested that he did not want to plead guilty. His body language was different than it had been in previous hearings when he was agitated because he was not getting along with his attorneys. The trial judge concluded that Chapman asked her to disregard her own observations, and that she could not do so. She found no credible evidence of deception, coercion, or intimidation perpetrated by Chapman's attorney.

[¶62] Turning to the record itself, Chapman's statements were patently incredible. He admitted that his lawyer spent two hours going back and forth between the room where he and his mother were located and the prosecuting attorney's office. This activity would be typical of a defense attorney attempting to negotiate a plea agreement. After this extended period of what would be aimless behavior on counsel's part if plea negotiations were not being conducted, Chapman entered the courtroom and calmly pled guilty to attempted second degree murder. He provided a spontaneous and credible factual basis to support the plea. He had not previously been reticent about expressing his disenchantment with his public defenders, and it is no wonder that the district judge found his claim to have been coerced incredible based on her observations of his behavior. The record is consistent with the district court's observations.

[¶63] Chapman and his mother claim that he was terribly upset with his lawyer and that he refused to even consider a plea agreement. This claim cannot be reconciled with his contention that he was misled into agreeing to one because he thought he would serve a little more than six years time in community corrections for shooting a man in the face at close range with a high-powered hunting rifle with the obvious intent to kill him.

[¶64] Chapman was on parole on felony charges in two other states at the time of the shooting, and the criminal history reflected in his presentence investigation report shows that these were not his first experiences with felony prosecution. It is simply unbelievable that any competent adult, much less one who has been previously prosecuted for and convicted of felonies, and who has been fully advised of his rights as Chapman had been, could believe that a trial judge could or would sentence a defendant

16

to life in prison without a guilty plea or a trial. This is a scenario too far-fetched even for Franz Kafka.[5]

[¶65] This claim is even more incredible in light of the fact that Chapman was present at a hearing on replacement counsel's motion to continue the trial on January 25, 2010, just eleven days before he changed his plea. He heard the court continue the trial date to allow counsel enough time to prepare. The transcript of that hearing clearly reflects that the trial judge was concerned about delay, and wanted Chapman to have his trial as soon as reasonably possible.

[¶66] Ms. Stevenson's testimony was itself incredible in some respects, but in others credibly undercut Chapman's claims. For example, she originally wrote in her narrative of the conversations between Chapman and his lawyer that he was told he could serve as little as sixteen years before being paroled, which would be about two-thirds of his minimum sentence. This was approximately the good time credit which the Department of Corrections records manager testified well-behaved inmates might expect to receive. Ms. Stevenson also corroborated defense counsel's claim that he spent two hours working on a plea agreement before one was reached.

[¶67] Finally, she testified that Chapman said that the numbers would need to be "really low" after his attorney conveyed the State's offer to recommend a sentence of thirty to fifty years. Although she was quick to explain that he meant that he really wanted to go to trial, the explanation makes no sense. All her son had to do to go to trial was to maintain his not guilty plea. He already had a trial date.

[¶68] The district judge did not abuse her discretion in denying Chapman's motion to withdraw his plea, and her findings of fact were certainly not clearly erroneous. She assessed the credibility of the witnesses, weighed conflicting testimony, and made necessary inferences, deductions, and conclusions based on what she had seen and heard. *See Brown v. State*, 944 P.2d 1168, 1170 (Wyo. 1997). She correctly ruled that Chapman failed to prove that manifest injustice would result from a refusal to allow him to withdraw his guilty plea.

### *Restitution Order*

[¶69] We must determine whether this Court has jurisdiction to consider Chapman's appeal of the district court's order of restitution. As noted above, the judgment and sentence was entered on February 9, 2010. No notice of appeal was filed until October 19, 2011, well over a year and a half later. Wyoming Rule of Appellate Procedure 2.01(a) allows an appellant only thirty days to file a notice of appeal.

---

[5] Franz Kafka, The Trial (1915).

[¶70] Rule 2.03 of the Wyoming Rules of Appellate Procedure provides that the running of time to file a notice of appeal is terminated by the timely filing of "a motion for judgment of acquittal made pursuant to Rule 29(c), Wyo. R. Cr. P.; a motion for a new trial made pursuant to Rule 33, Wyo. R. Cr. P.; or a motion in arrest of judgment made pursuant to Rule 34, Wyo. R. Cr. P." W.R.A.P. 2.03. Motions to withdraw a guilty plea are not included on the above list, and therefore do not toll the time for filing a notice of appeal. Chapman's time to appeal the restitution provisions of the judgment and sentence was not therefore extended by the motion to withdraw his guilty plea, and the notice of appeal filed in 2011 was therefore untimely. "The failure to file a timely notice of appeal from a final, appealable order deprives this Court of jurisdiction to hear the appeal." *Cook*, ¶ 10, 202 P.3d at 400 (citing *Yeager*, ¶ 14, 78 P.3d at 247).

[¶71] Chapman filed motions to correct an illegal sentence on December 27, 2011 and February 22, 2012, long after a judgment and sentence had been entered, after the hearing on Chapman's motion to withdraw his guilty plea, and after a notice of appeal concerning the denial of that motion had been filed. In each motion he claimed that he was unable to pay restitution and that the judgment and sentence ordering it was therefore illegal. The court made a minute entry indicating that it would not act upon the motion due to the pendency of this appeal.

[¶72] An award of restitution may be reviewed on a motion to correct an illegal sentence if it is claimed that the sentencing court exceeded its authority when it made the award, but not if the claim is that the decision to award restitution was factually erroneous. *Hite v. State*, 2007 WY 199, ¶ 10, 172 P.3d 737, 739–40 (Wyo. 2007). "A challenge to the legal authority of a sentencing court to impose restitution . . . is essentially an allegation that an illegal sentence has been imposed." *Id.* We have previously reviewed claims of an illegal sentence to promote judicial economy even when the issue has not been resolved by the trial court:

> Our rules of criminal procedure authorize a trial court to correct an illegal sentence at any time. W.R.Cr.P. 35(a). A motion to correct an illegal sentence is properly addressed to the trial court in the first instance. *Kahlsdorf v. State,* 823 P.2d 1184, 1189 (Wyo. 1991). For reasons of judicial economy, however, we have considered illegal sentence claims when the issue was raised for the first time on appeal, *Price v. State,* 716 P.2d 324, 328 (Wyo. 1986), and when the issue, although mentioned in the trial court, was not pursued until appeal. *Kahlsdorf,* 823 P.2d at 1189.

18

*Sarr v. State,* 2007 WY 140, ¶ 12, 166 P.3d 891, 895 (Wyo. 2007). We are not precluded from considering the legality of Mr. Endris's sentence for the first time on appeal.

*Endris v. State*, 2010 WY 73, ¶ 21, 233 P.3d 578, 583 (Wyo. 2010).

[¶73]  Chapman's claim that the restitution award was an illegal sentence is flawed by the failure to file a timely appeal, as well as by the absence of any final order disposing of his motion to correct an illegal sentence or an appeal from such an order.  We would be justified and probably well-advised to decline to consider the issue at all.  However, because any decision the district court might later make could only be reviewed to determine whether the court had authority to order restitution as it did, we will reach the merits of that question in an effort to promote judicial economy.

[¶74]  Chapman argues that the district court lacked authority to award restitution while waiving public defender fees because restitution is lower on the list of priorities set forth in Rule 32.1 of the Wyoming Rules of Criminal Procedure than public defender fees. This is clearly incorrect.  Rule 32.1 provides as follows:

> The clerk of court shall use the following prioritized order when distributing offender payments and restitution:
>
> 1. Crime Victims Compensation Surcharge (Wyo. Stat. Ann. § 1-40-119)
> 2. Judicial Systems Automation Fee (Wyo. Stat. Ann. § 5-2-120)
> 3. Indigent Civil Legal Services Fee (Wyo. Stat. Ann. § 5-2-121)
> 4. **Restitution** as follows:
>
> .   .   .
>
> 5. Court costs
> 6. Fines
> 7. **Fees (in the following order, including but not limited to: public defender fee,** prosecution fee, addicted offender fee, probation fee, jail costs, extradition fee, and other fees)
> 8. Contempt.

W.R.Cr.P. 32.1 (emphasis added).  By its plain language, Rule 32.1 does not prioritize distribution of public defender fees over an order of restitution.  Chapman has mischaracterized the "Indigent Civil Legal Services Fee," referring to it as "a.k.a. Public Defender fees."

[¶75] After July 1, 2012, a fee currently set at $10.00 is to be collected in all civil and criminal cases to fund a program to provide civil legal services for the indigent. Wyo. Stat. Ann. §§ 5-2-121; 5-2-122; 6-10-102 (LexisNexis 2011). This assessment has nothing whatsoever to do with public defender fees, which are specifically listed lower than restitution on the list of priorities in a portion of Rule 32.1 which was not quoted in Chapman's brief. We therefore conclude that the district court had authority to prioritize restitution over public defender fees as it did.

[¶76] It might be argued that the district court should have ordered Chapman to pay public defender fees as well as restitution. Even if this were true, Chapman benefitted from that claimed error. Rule 9.04 of the Wyoming Rules of Appellate Procedure directs a reviewing court to disregard harmless error, which is defined as "[a]ny error, defect, irregularity or variance which does not affect substantial rights . . . ." W.R.A.P. 9.04; *see also Condra v. State*, 2004 WY 131, ¶ 29, 100 P.3d 386, 394 (Wyo. 2004) ("An error must be 'injurious or prejudicial' to warrant reversal . . . .") (citing *Spilman v. State*, 633 P.2d 183, 185 (Wyo. 1981)). Chapman cannot obtain a reversal for an error in his favor. *See id.*

## CONCLUSION

[¶77] The district court acted reasonably and within its discretion in denying Chapman's motion to withdraw his guilty plea. Chapman did not timely appeal the restitution provisions of his judgment and sentence, and he thereby waived his right to challenge anything other than the district court's authority to make the award. The court had authority to award restitution and waive public defender fees as it did under W.R.Cr.P. 32.1. Affirmed.