# IN THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 29

OCTOBER TERM, A.D. 2024

March 17, 2025

CONTANGO RESOURCES, LLC,

Appellant
(Petitioner),

v.

S-24-0185

FREMONT COUNTY, WYOMING,

Appellee
(Respondent).

---

*Appeal from the District Court of Fremont County*
*The Honorable Kate G. McKay, Judge*

*Representing Appellant:*
    Matthew J. Micheli and Kasey June Schlueter, Holland & Hart LLP, Cheyenne, Wyoming. Argument by Ms. Schlueter.

*Representing Appellee:*
    Amanda Ferguson Esch and Catherine Maegan Young, Davis & Cannon, LLP, Cheyenne, Wyoming. Argument by Ms. Young.

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

---

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BOOMGAARDEN, Justice.**

[¶1]    In 2021, Contango Resources, LLC purchased oil and gas production and processing facilities located in Fremont and Sweetwater Counties, and in 2022, the Fremont County Assessor assessed the taxable value of the property located in Fremont County.  Contango appealed the assessment to the Fremont County Board of Equalization claiming the County Assessor and her expert consultant failed to properly use the purchase price of the property in making their valuations and used improper trending and depreciation factors.  The County Board upheld the valuation, and the State Board of Equalization and district court affirmed.  We likewise affirm.

## ISSUES

[¶2]    This appeal presents two issues:

> 1. Was the County Board's decision upholding the County Assessor's rejection of the property's purchase price as a starting point for valuation supported by substantial evidence and in accordance with law?
>
> 2. Was the County Board's decision upholding the County Assessor's application of trending and depreciation factors in the valuation in accordance with law?

## FACTS

[¶3]    In 2021, Contango acquired property and oil and gas reserves from ConocoPhillips pursuant to a Purchase and Sale Agreement (PSA) for $67 million.  The PSA transferred property that was located in both Fremont County, Wyoming, and Sweetwater County, Wyoming.  The property included the Lost Cabin Gas Plant (Plant) and Lost Creek Gathering Lines, and eight wells that feed directly to the Plant (referred to herein as the more complex property).  The property also included oil and gas equipment associated with wells that did not feed directly to the Plant, residential improvements, commercial land and improvements, and an amine plant (referred to herein as the less complex property).

**The PSA**

[¶4]    The PSA resulted from a closed bidding process conducted through an investment company.  ConocoPhillips told Contango there were multiple bidders, but Contango had no information concerning who the other bidders were, how many bids there were, the dollar amount of the other bids, or whether the other bidders engaged in negotiations with ConocoPhillips.

1

[¶5]    The PSA contained an "Allocated Value Schedule" that showed how the $67 million purchase price was allocated among certain categories of assets acquired in the purchase. Although the purchase involved thousands of pieces of equipment, the Allocated Value Schedule set forth only fifteen general categories and did not identify a value for any particular piece of equipment acquired in the purchase. The schedule did not differentiate between Fremont and Sweetwater County assets, and it did not assign a value to the oil and gas reserves.

**The Assessments**

[¶6]    Contango's purchase did not make it a full owner of the property. Instead, because ConocoPhillips had been an owner of only a percentage of the property, Contango acquired only that interest. Nonetheless, as the operator, Contango was responsible for the tax assessment of the full market value of the property, not just the percentage it owned.[1]

[¶7]    In valuing the property, the County Assessor divided the property into two portions, each of which, when Contango appealed the eventual assessments, the County Board of Equalization docketed separately but consolidated for hearing.[2] Docket 2022-01 concerned the valuation of the more complex oil and gas equipment associated with the Lost Cabin Gas Plant and the Lost Creek Gathering Lines. Because of the complexity of this portion of the property and its valuation, the County Assessor retained an outside expert, TY Pickett, to appraise the property.

[¶8]    Docket No. 2022-02 concerned the valuation of the less complex property. The County Assessor and her staff appraised this portion of the property.

[¶9]    Before valuing either the more or less complex property, the County Assessor provided Contango with detailed itemized renditions listing cost information for and the age and condition of the Fremont County property to be valued, based on information reported by the taxpayer the previous year. Contango had the opportunity to update the list and make changes to the information provided for each item, but it returned the completed renditions without changes. Each rendition was accompanied by a sworn affidavit affirming that the information provided was complete and accurate. The total value reflected in the renditions was higher than the $67 million that Contango paid for the property.

**Valuation of the More Complex Property**

---

[1] Because Contango was responsible for the tax assessment on the full value of the property, its expert calculated a "grossed up" or "trued up" price, or a theoretical price paid for all assets, assuming terms similar to the PSA. Contango's expert posited that had Contango purchased 100% of all reserves, land, facilities, and equipment, it would have paid $122.3 million for the property.

[2] The assessed property did not include the oil and gas reserves, and so the County Assessor did not include them in her valuation.

[¶10]  Robert Lehn of TY Pickett appraised the more complex property.  Mr. Lehn had extensive experience in valuing complex oil and gas properties, including the Lost Cabin Gas Plant, which he had assisted in appraising since its inception in late 1994 or early 1995.

[¶11]  Mr. Lehn's appraisal began with a site tour and meetings with Plant personnel to update information he had from prior appraisals concerning the Plant and its ongoing projects.  He also received and reviewed Contango's renditions, and he considered the Plant's history and operational challenges.

[¶12]  Mr. Lehn used a "cost approach" to value the property.[3]  In performing his cost approach analysis, Mr. Lehn first calculated a replacement cost new by applying a trending factor to the originally reported cost of the property in 1994.[4]  To determine replacement cost new, appraisers also apply economic or functional obsolescence if justified by the known information about the property.  In performing this analysis, Mr. Lehn used trending, depreciation, and obsolescence factors developed from a variety of sources, including TY Pickett developed data, examination of oil and gas industry practices, Marshall & Swift data, and various studies.[5]

[¶13]  Mr. Lehn did not use Contango's purchase price as a starting point in his cost approach analysis.  He instead used the purchase price as a single data point in adjusting for "economic obsolescence," based on the actual use and condition of the property.[6]  He explained:

> I felt that ConocoPhillips probably wouldn't have sold the facility to Contango without due consideration being given to what Contango might do with it.  In other words, these two people looked at it – these two sets of corporations looked at it and did effect – it projected an outcome to me that perhaps things were not as optimistic as they had been in the previous years. * * *

---

[3] The cost approach is one of three approaches that can be used to value property, and "relies on the principle of substitution in which an informed buyer will not pay more for a property than its comparable replacement."  *Rules*, *Wyo. Dept. of Rev.*, ch. 9 § 5(b)(ii) (2016).  It is a method of determining the cost to replace property less different forms of depreciation.

[4] A trending factor is the difference between the dollar today and a dollar the year the equipment was first reported; it provides a way to convert the original cost to its present-day value.

[5] Marshall & Swift is a nationwide provider of valuation data.

[6] Economic obsolescence is the "[i]mpairment of desirability or useful life arising from factors external to the property, such as economic forces or environmental changes which affect supply-demand relationships in the market."  *Rules, Dept. of Rev.*, ch. 9 § 4(a)(xii)(C).

[¶14]  Ultimately, Mr. Lehn valued the more complex property at a total of $160,718,740. After applying relevant exemptions for emissions and fire control, the County Assessor issued notices of assessment for the more complex property totaling $144,919,320.

**Valuation of the Less Complex Property**

[¶15]  The County Assessor, with the assistance of her staff, appraised the less complex property associated with Docket No. 2022-02.  Deputy Assessor Mike Klaassen, who handles all appraisals for oil and gas properties in the county, performed the analysis in consultation with the Assessor.  He used a variation on the cost approach called the trended cost approach, which is a "procedure for estimating replacement cost of property by trending its original or historical cost with a factor from an appropriate construction cost index." *See Rules*, *Wyo. Dept. of Rev.*, ch. 9 § 4(a)(xli).

[¶16]  Mr. Klaassen relied on the information Contango provided in its renditions, which he entered into the Wyoming Department of Revenue Computer Assisted Mass Appraisal System (CAMA).  As a starting point, he entered the historical cost of each piece of property as reported by Contango.  He also used trending factors from the State of Wyoming Personal Property Valuation Manual (2022) (Property Manual), which are also incorporated into the CAMA system.[7]  He accounted for depreciation using tables in the Property Manual and the condition of the property as reported by Contango.  In some cases, he also used publicly available information to further depreciate the value, such as information from the Wyoming Oil and Gas Commission concerning nonproducing wells.

[¶17]  The County Assessor reviewed and considered the PSA, and she requested additional information from Contango, including a breakdown of the price allocation, but Contango provided no additional information.  Ultimately, the Assessor did not use the $67 million purchase price in any way to value the less complex property because she did not consider it a reliable indicator of fair market value.  Among the Assessor's concerns were the complexity of the PSA; a lack of information concerning financing arrangements or motivations to enter the PSA; and a lack of information concerning how the Allocated Value Schedule was derived.

[¶18]  The County Assessor valued the less complex property associated with Docket No. 2022-02 at a total of $45,274,622.  Combined with the valuation of the more complex

---

[7] The Property Manual is a manual issued annually by the Department of Revenue.  *Rules, Dept. of Rev.*, ch. 9 § 5(c)(i)(C)(II).  It is developed in accordance with "information and procedures from various sources including Federal Law, Wyoming Constitution, Wyoming Statutes, Department of Revenue Rules & Regulations, Uniform Standards of Professional Appraisal Practice, IAAO Standards and Appraised Methodology, and additional outside sources." *Property Manual* at 3.

property associated with Docket No. 2022-01 at $144,919,320, the total valuation of the Contango property was approximately $190,000,000.[8]

**Contango's Appeal**

[¶19]  Contango filed separate statements contesting the assessments for the less complex and more complex properties.  As noted above, the County Board of Equalization docketed each appeal separately but consolidated them for hearing.

[¶20]  Before the County Board, Contango claimed two errors in the assessments against its property.  It first claimed that both the County Assessor and her expert should have placed greater reliance on the purchase price and the Allocated Value Schedule contained in the PSA in valuing the property, and the fact that the assessed value was so much higher than purchase price demonstrated error in the assessment.  It argued that it overcame the presumption that the Assessor's valuation was correct because the Assessor rejected the purchase price altogether, while her expert relied on it in calculating obsolescence, showing an inconsistency in how the property was valued.  In its second claim of error, Contango argued that both the County Assessor and her expert made errors in their trending and depreciation analysis by failing to use the Department of Revenue recommended trending and depreciation tables.

[¶21]  The County Board rejected Contango's claims, concluding it had not overcome the presumption in favor of the County Assessor's valuation.  It found the Assessor was not required to accept and apply the purchase price under the PSA without question, and that she had appropriately exercised her discretion in how it was applied in each separate assessment.  It held that a difference of opinion as to how the PSA should have been applied was not sufficient to show the Assessor erred.  The County Board also rejected the argument that the size of the difference between the Assessor's valuation and Contango's valuation evidenced error, finding that a difference in values alone also was not sufficient to overcome the presumption in favor of the Assessor's valuation.  The County Board further concluded that the Assessor's use of trending and depreciation tables that differed from those provided by the Department of Revenue was proper in the absence of a showing that they were incorrect or invalid.

[¶22]  The State Board of Equalization and the district court both affirmed.  Contango timely appealed to this Court.

*STANDARD OF REVIEW*

---

[8] Contango claims the valuation totaled $214,000,000 and that the County Board of Equalization relied on an incorrect calculation of the valuations.  Contango cites only to conclusory statements of its $214,000,000 figure by its expert and to general parts of the record, with no explanation of how it calculated that figure or what was mistaken in the County Assessor's or the County Board's calculations.  We will therefore use the approximately $190,000,000 figure in addressing Contango's appeal.

[¶23] "Our review is focused on the County Board's decisions, and we do not defer to the decision of the State Board of Equalization or to that of the district court." *State v. Uinta Cnty. Assessor*, 2024 WY 106, ¶ 9, 557 P.3d 298, 301 (Wyo. 2024) (quoting *Teton Cnty. Assessor v. Aspen S, LLC*, 2024 WY 30, ¶ 6, 545 P.3d 427, 429 (Wyo. 2024)). Our review of the County Board's decision is governed by Wyo. Stat. Ann. § 16-3-114(c) (2023). *Id.* Thus on review, we:

> (i) Compel agency action unlawfully withheld or unreasonably delayed; and
>
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be
>
> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; [or]
>
> * * *
>
> (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c).

[¶24] "The primary focus of our review is whether the County Board's decision was lawful and supported by substantial evidence." *Uinta Cnty. Assessor*, 2024 WY 106, ¶ 10, 557 P.3d at 301 (quoting *Teton Cnty. Assessor*, 2024 WY 30, ¶ 6, 545 P.3d at 429). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support' the decision." *Id.* (quoting *Teton Cnty. Assessor*, 2024 WY 30, ¶ 7, 545 P.3d at 429). "A finding of fact is 'supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for it.'" *Gray v. Converse Cnty. Assessor*, 2023 WY 116, ¶ 7, 539 P.3d 107, 111 (Wyo. 2023) (quoting *Bd. of Trustees of Lincoln Cnty. Sch. Dist. No. Two v. Earling*, 2022 WY 23, ¶ 34, 503 P.3d 629, 638 (Wyo. 2022)). We review the County Board's conclusions of law de novo. *Gray*, 2023 WY 116, ¶ 7, 539 P.3d at 110 (quoting *Solvay Chemicals, Inc. v. Wyo. Dep't of Revenue*, 2022 WY 122, ¶ 7, 517 P.3d 1123, 1127–28 (Wyo. 2022)).

## DISCUSSION

[¶25] The Wyoming Constitution mandates that all property be equally and uniformly valued for tax purposes. Wyo. Const. Art. 15, sec. 11(a), (d). "To accomplish that directive an assessor must adopt a rational method of appraisal, equally applied to all property, which results in essential fairness." *Thunder Basin Coal Co. v. Campbell Cnty.*, 2006 WY 44,

¶ 18, 132 P.3d 801, 807 (Wyo. 2006) (cleaned up) (quoting *Holly Sugar Corp. v. State Bd. of Equalization*, 839 P.2d 959, 964 (Wyo. 1992)). To that end, all taxable property, real and personal, must be valued at its fair market value for property tax purposes. Wyo. Stat. Ann. § 39–13–103(b)(ii) (2023). "Fair market value" is statutorily defined as follows:

> "Fair market value" means the amount in cash, or terms reasonably equivalent to cash, a well informed buyer is justified in paying for a property and a well informed seller is justified in accepting, assuming neither party to the transaction is acting under undue compulsion, and assuming the property has been offered in the open market for a reasonable time . . .[.]"

Wyo. Stat. Ann. § 39-11-101(a)(vi) (2023).

[¶26] "The Department of Revenue 'prescribe[s] by rule and regulation the appraisal methods and systems for determining fair market value using generally accepted appraisal standards.'" *Gray*, 2023 WY 116, ¶ 17, 539 P.3d at 113 (quoting Wyo. Stat. Ann. § 39-13-103(b)(ii)). The Department's rules provide three methods of appraisal to determine fair market value: cost, sales comparison, and income or capitalized earnings. *Rules*, *Wyo. Dept. of Rev.*, ch. 9 § 5(b). The Department's rules define the cost approach as "a method of estimating value by summing the land value, where applicable, with the depreciated value of improvements." *Rules*, *Wyo. Dept. of Rev.*, ch. 9 § 5(b)(ii).

[¶27] The parties agree the cost approach was properly used as the method of valuation in this case. They disagree concerning the proper role of the PSA purchase price in performing the valuation under the cost approach, as well as how the County Assessor and her expert applied the trending and depreciation factors in valuing the more complex property. In addressing Contango's contentions in each of these areas, we recognize that a "strong presumption favors the county assessor's valuation." *Mountain Vista Ret. Residence v. Fremont Cnty. Assessor*, 2015 WY 117, ¶ 12, 356 P.3d 269, 273 (Wyo. 2015); *see also* Wyo. Stat. Ann. § 39-13-109(b)(i). "Absent evidence to the contrary, 'we presume that the officials charged with establishing value exercised honest judgment in accordance with the applicable rules, regulations, and other directives that have passed public scrutiny, either through legislative enactment or agency rule-making, or both.'" *Helmut J. Mueller Ltd. P'ship v. Treanor*, 2018 WY 131, ¶ 13, 430 P.3d 733, 737 (Wyo. 2018) (quoting *Mountain Vista*, 2015 WY 117, ¶ 12, 356 P.3d at 273).

[¶28] The presumption in favor of an assessor's valuation sets up shifting burdens. Contango had the initial burden of presenting credible evidence to overcome the presumption. *Helmut J. Mueller*, 2018 WY 131, ¶ 13, 430 P.3d at 737. If Contango had met that burden, the burden would have shifted to the Assessor to defend the valuation. *Id.* Contango "had the ultimate burden of persuasion to prove, by a preponderance of the

7

evidence, that the Assessor's valuations were not derived in accordance with the required constitutional and statutory requirements for valuing property." *Id.* (citing *Mountain Vista*, ¶ 12, 356 P.3d at 274).

## I.     The County Board's decision upholding the Assessor's limited reliance on the PSA purchase price was supported by substantial evidence and in accordance with law.

[¶29]  Contango asserts the record shows that the PSA was an arm's-length transaction entered into between a well-informed seller and buyer, neither of which was acting under compulsion, after the property was on the open market for a reasonable time.  It thus contends that Department of Revenue guidance and our decision in *Thunder Basin* mandate that the PSA price be the starting point in assessing the taxable value of its property.  It further contends that the fact that the Assessor's expert used the PSA price as a data point in valuing the more complex property demonstrates the arbitrariness of the Assessor's decision to reject any use of the PSA price when valuing the less complex property. Contango thus contends the County Board's decision upholding the Assessor's valuation was unsupported by substantial evidence and not in accordance with law.  We disagree.

[¶30]  In applying the cost approach, "the appraiser must determine an appropriate 'starting point' cost to utilize."  *Property Manual* at 43.  The property manual identifies four potential starting point costs, including the "historical cost," which the County Assessor and her expert used in their valuations, and the "original cost," for which Contango advocated.  *Id.*  Historical cost refers to "the cost of an item at the time it was initially acquired by the original user."  *Id.*  Original cost refers to "[t]he cost to the present owner at a new or used price."  *Id.*

[¶31]  The Property Manual does not mandate the use of a particular starting point in a valuation, and it cautions that during valuation, an assessor "must be careful to distinguish between price and value which can be vastly different as reported by a taxpayer." *Property Manual* at 43, 36.  In contrast to market value, market price is:

> [t]he amount actually paid or about to be paid in a particular transaction.  No allowance is made for financing terms, knowledge or prudent conduct on the part of the buyer or seller, degree or type of stimulus motivating either or both, use for which the property is best suited or to which it will be put, or length of time the property has been offered on the open market.  Market price can be influenced by many factors other than value.

*Id.* at 36-37

[¶32]   Recognizing the variables at play, the Property Manual contemplates that choosing the starting point for valuation requires the exercise of an assessor's judgment based on the circumstances.  Nothing in our decision in *Thunder Basin* changed that.

[¶33]   In *Thunder Basin*, the assessor, as in this case, hired an expert to assist with the property valuation.  2006 WY 44, ¶ 4, 132 P.3d at 804.  The expert requested valuation information from Thunder Basin, and Thunder Basin provided a schedule of fixed assets that contained "current book costs" taken from an appraisal at the time it acquired the property in question.  *Id.*  Based on this information, the expert used the cost approach to value the property, starting with the acquisition price as reflected in the allocation of values the taxpayer had provided.  *Id.*, ¶¶ 5, 16, 132 P.3d at 804, 807.  Thunder Basin challenged the starting point arguing "the values do not accurately reflect the fair market value of the property because the allocation of the purchase price paid by Thunder Basin was for income tax purposes and not to establish fair market value for purposes of property tax." *Id.*, ¶ 17, 132 P.3d at 807.

[¶34]   In rejecting Thunder Basin's position, this Court noted that the assessor "was entitled to rely upon the information submitted by Thunder Basin as accurate and reliable." *Id.*, ¶ 25, 132 P.3d at 809.  The Court further observed that "[n]othing in the statutes, regulations or guidelines prohibits the use of the acquisition cost of used personal property as the starting place for the cost method of appraisal and, in fact, the guidelines seem to direct it." *Id.*, ¶ 21, 132 P.3d at 808.  We concluded that "both the guidelines and the rules suggest, directly and indirectly, the actual acquisition price and date are a proper starting point for applying the cost method to used property[,]" and based on our review of the record, we agreed with the county board that the approach in that case was a "rational method of appraisal, equally applied to all property." *Id.*, ¶¶ 23-24, 132 P.3d at 809.  In other words, we held that acquisition price was a permissible starting point in valuating property under the cost approach, and substantial evidence supported its use.  We did not, however, mandate its use or hold that it was the only starting point when using the cost approach to value property.

[¶35]   The case before us presents a different set of circumstances.  First, the transaction was the result of a closed bid process.[9]  This Court has held that because such transactions are not open market transactions, the "fair value is not established by the sale, and the assessor may disregard the sale price in favor of other proper criteria used to determine fair value." *Gray v. Wyo. State Bd. of Equalization*, 896 P.2d 1347, 1353 (Wyo. 1995) (quoting *Union Pac. R.R. v. Wyo. State Bd. of Equalization*, 802 P.2d 856, 862 (Wyo. 1990)).  In *Union Pacific*, the Court qualified this holding:

---

[9] *Thunder Basin* does not provide details concerning the type of transaction that resulted in Thunder Basin owning the property at issue.  There was, however, no discussion of a bid process, and in opposing Thunder Basin's argument for greater depreciation, the assessor contended "depreciation of the property was taken into account by the buyer and seller in negotiating the 1998 transaction."  ¶ 23, 132 P.3d at 809. We thus presume the purchase was a negotiated transaction.

We are unwilling to say that no auction of a property could ever provide its fair value for tax assessment purposes. But where a property is only offered to dealers using sealed bids and the value paid by the successful bidder is grossly disproportionate to the assessed value (accounting for depreciation), we hold that fair value is not established by the sale, and the assessor may disregard the sale price in favor of other proper criteria used to determine fair value.

802 P.2d at 862.

[¶36] That brings us to the second distinction between *Thunder Basin* and this case. In *Thunder Basin*, the value allocation that Thunder Basin provided the assessor was consistent with the acquisition price. 2006 WY 44, ¶ 21, 132 P.3d at 808. In contrast, in this case, the unchanged renditions Contango submitted to the County Assessor reflected a value much higher than the acquisition price. Under such circumstances, the Assessor was justified in requesting additional information and then rejecting the acquisition price as an indicator of fair market value when no additional information was provided.

[¶37] We are not persuaded otherwise by the evidence Contango asserts as proof that the property was in fact sold on the open market. The evidence consists of a ConocoPhillips press release and minutes from a meeting of the Fremont County Board of County Commissioners, which established no more than that in February 2021, ConocoPhillips announced it was in the initial stages of marketing the property. Neither exhibit indicated to whom ConocoPhillips was marketing the property, how widely it was marketing it, or how long it would be marketing it. Given the dearth of information, the evidence provides no assurance that the market determined the final acquisition price rather than other considerations.

[¶38] Even at the hearing before the County Board, Contango was unable to explain its Allocated Value Schedule and how the prices were assigned to the schedule's broad categories of property. This made it impossible to ascertain whether the schedule's assigned prices derived from actual consideration of the property's value or other unknown considerations. Adding to the complexity was the lack of detail concerning value assigned to the portion of the property located in Sweetwater County and the value assigned to reserves.[10]

---

[10] Contango eventually provided a Purchase Price Allocation Summary breaking down value assigned to reserves versus equipment, but it provided no explanation of how that division was determined. The same summary contained a note concerning allocation between Fremont and Sweetwater Counties, but again the record provides no detail on those divisions or explanation of how they were determined.

[¶39] In contrast to the ambiguity surrounding the value reflected in the $122 million trued-up acquisition price and the Allocated Value Schedule, the County Assessor and her expert had the itemized renditions Contango itself submitted, detailing the historic cost and condition of each item of property to be valued. As noted earlier, Contango had an opportunity to revise the renditions to link the values reported there to the acquisition price, but it did not do so; nor did it at any time provide an alternative appraisal to support the acquisition price as the value or as a starting point in the valuation. *See Wyo. Dep't of Revenue v. Quest Corp.*, 2011 WY 146, ¶ 25, 263 P.3d 622, 629 (Wyo. 2011) (burden is on taxpayer to provide information necessary for valuation). The County Assessor and her expert relied on the values set forth in the Contango-provided renditions as a starting point for the valuations, and as this Court said in *Thunder Basin*:

> The County Assessor was entitled to rely upon the information submitted by Thunder Basin as accurate and reliable. As we have repeatedly stated in the past, the taxpayer bears the burden of providing accurate information to the assessor for preparation of a valuation of its properties. The taxpayer should not, therefore, be heard to complain when the assessor relies upon the information supplied to him for the particular purpose of establishing value.

2006 WY 44, ¶ 25, 132 P.3d at 809 (citations omitted).

[¶40] "In reviewing a valuation method, the task of the appellate court is not to determine which of various appraisal methods is best or most accurately estimates fair market value. The reviewing court only determines whether substantial evidence exists to support use of the chosen method." *Britt v. Fremont Cnty. Assessor*, 2006 WY 10, ¶ 17, 126 P.3d 117, 123 (Wyo. 2006) (quoting *BP Am. Prod. Co. v. Dept. of Revenue*, 2005 WY 60, ¶¶ 10–13, 112 P.3d 596, 602–603 (Wyo. 2005)). The County Assessor and her expert relied on information provided by Contango rather than the acquisition price and unexplained Allocated Value Schedule, and the record shows there was substantial evidence to support that approach. Contango's contention as to the wide gap between the assessed value and the purchase price does not undermine this conclusion and is insufficient to overcome the presumption favoring the Assessor's valuation. *See Gray*, 2023 WY 116, ¶ 21, 539 P.3d at 114 ("This Court has held '[a] mere difference of opinion as to value does not amount to substantial evidence' to overcome the presumption in favor of the valuation.") (quoting *Britt*, 2006 WY 10, ¶ 28, 126 P.3d at 126).

[¶41] We likewise reject Contango's argument that the expert's use of the purchase price in calculating economic obsolescence of the more complex property shows an inconsistency and arbitrariness in the County Assessor's rejection of the price in valuing the less complex property. First, Contango's focus below and on appeal has been on use of the purchase price as a starting point in the valuation, and neither the Assessor nor her

expert used it for that purpose. Indeed, Mr. Lehn expressly rejected the Allocated Value Schedule, commenting that he does not "take well" to being told about allocated values without an independent basis.

[¶42]   Additionally, Mr. Lehn valued the more complex portion of the property, including the Plant, which was critical to the property's ability to generate revenue. His use of the discounted purchase price as a single data point in his economic obsolescence analysis was not dependent on whether that price or the Allocated Value Schedule was a reliable indicator of the current value of the individual items of property. It was instead a consideration of what might have been the reason for the discounted price, namely the expected economic yield from the property. While that consideration may be a factor in the property's overall value, it provides little as a starting point for valuing each individual item of property.

[¶43]   We find no inconsistency or arbitrariness in how the Assessor used the purchase price in valuing the less complex and more complex properties. We therefore find no error in the County Board's conclusion that Contango failed to overcome the presumption favoring the County Assessor's rejection of the purchase price as a starting point in the property valuation.

## II.    The County Board acted in accordance with law in upholding the Assessor's application of trending and depreciation factors to the more complex property.

[¶44]   Contango claims that TY Pickett's use of its own trending and depreciation tables in valuing the more complex property, rather than those the Department of Revenue included in the Property Manual, resulted in a higher valuation that was not in accordance with law.[11] It contends the County Board erred in ruling otherwise. We again disagree.

[¶45]   The Wyoming Legislature has directed that "[a]ll taxable property shall be annually valued at its fair market value. Except as otherwise provided by law for specific property, the department shall prescribe by rule and regulation the appraisal methods and systems for determining fair market value using generally accepted appraisal standards." Wyo. Stat. Ann. § 39-13-103(b)(ii). To that end, and specific to county assessments, the Department of Revenue promulgated Chapter 9 of its rules.

---

[11] In the proceedings below, Contango contested the trending and depreciation factors applied to both the less complex and more complex property. In its briefing before this Court, however, Contango offers argument only concerning the trending and depreciation applied to the more complex property. Accordingly, we do not address the trending and depreciation applied to the less complex property. *See Pettengill v. Castellow*, 2022 WY 144, ¶ 24, 520 P.3d 105, 113 (Wyo. 2022) ("We 'will not frame the issues for the litigants and will not consider issues not raised by them and not supported by cogent argument and authoritative citation.'") (quoting *Statzer v. Statzer*, 2022 WY 117, ¶ 24, 517 P.3d 574, 581–82 (Wyo. 2022)).

[¶46]  Relevant to Contango's claim, the Department's rules direct that "appraisers may use *any credible source* to establish costs . . ., including, but not limited to 'blue book' . . ., Marshall and Swift Valuation Service and information developed by the Division."  *Rules, Wyo. Dept. of Rev.*, ch. 9 § 5(c)(i)(C) (emphasis added).  The rules direct the Department's property tax division to develop and include in the Property Manual "cost trend factor tables, economic life tables, and depreciation tables."  *Id.*, § 5(c)(i)(C)(III).  They further direct the division to provide tables of depreciation factors, while also noting that "[o]ther rates of depreciation may be developed by the appraiser."  *Id.*, § 5(c)(i)((D)(III).  The Property Manual itself states that it is "designed to assist county assessors" and emphasizes that it is "designed solely as a guide and does not substitute the required appraisal knowledge and training required during the valuation of personal property."  *Property Manual* at 3.

[¶47]  As the County Assessor contends, the Department's rules and the Property Manual leave room for an appraiser to rely on sources outside the Property Manual for trending and depreciation factors.  *See Thunder Basin*, 2006 WY 44, ¶ 29, 132 P.3d at 810 ("Three methods of measuring economic obsolescence are set out, but they are not exclusive and the DOR regulations do not require the use of those methods.").  Contango acknowledges this but points to Chapter 9, § 4(a)(iii) of the rules, which defines an appraiser as "[a] certified Wyoming assessing official as designated by Wyoming Department of Revenue, Rules and Regulations, Chapter 13."  It contends that because Mr. Lehn is not an appraiser as defined by the rules, he was not permitted to rely on trending and depreciation factors outside the Property Manual.  We decline to consider this argument for two reasons.

[¶48]  First, the record contains no indication that Contango made this argument to the County Board when challenging Mr. Lehn's trending and depreciation analysis, and we generally do not consider new arguments on appeal.  *Sorenson v. Halling*, 2025 WY 8, ¶ 26, 561 P.3d 1241, 1248 (Wyo. 2025) ("[W]e do not consider new arguments on appeal unless they are jurisdictional or fundamental.").  Additionally, Contango did not support its argument, and its suggested interpretation of the rules, with any analysis under our rules of interpretation.  *See Keefe v. State*, 2024 WY 93, ¶ 11, 555 P.3d 492, 496 (Wyo. 2024) (declining to consider argument not supported by pertinent legal authority or cogent argument).

[¶49]  In accordance with the Department of Revenue's rules, Mr. Lehn was permitted to rely on trending and depreciation factors outside those prescribed by the property tax division if the sources he relied on were credible.  Contango has not argued that the sources were not credible; it instead argues only that their application resulted in a higher valuation than the Department's tables would have produced.  That is insufficient to overcome the presumption favoring the County Assessor's valuation.  *Gray*, 2023 WY 116, ¶ 21, 539 P.3d at 114 (holding that "mere difference of opinion as to value" does not overcome presumption in favor of valuation).

13

## *CONCLUSION*

[¶50]  The County Board's ruling upholding the County Assessor's limited use of the acquisition price in valuing Contango's property was supported by substantial evidence and in accordance with law.  Likewise, its ruling upholding the use of trending and depreciation factors outside those recommended by the Department of Revenue was in accordance with law.  We therefore affirm.